# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | § | |
| **OPPORTUNITY COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 4:11-CV-3425** |
| | § | |
| **BASS PRO OUTDOOR WORLD, LLC,** | § | |
| **BASS PRO, INC., and** | § | |
| **TRACKER MARINE, LLC** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended

Complaint ("SAC"). (Doc. No. 76.) After considering the Motion, all responses and replies

thereto, and the applicable law, the Court concludes that the Motion should be **GRANTED**

in part and **DENIED** in part.

## I. FACTS

The Court reviewed the facts of this case in a prior Memorandum and Order (Doc.

No. 53) and will not do so again. The Equal Employment Opportunity Commission

("EEOC") brings this discrimination action against Bass Pro Outdoor World, LLC

("BPOW"), and Tracker Marine, LLC ("Tracker") (collectively, "Defendants"). The EEOC

alleges that Tracker and BPOW are both owned and controlled by Bass Pro, Inc. The EEOC

brings this suit pursuant to Title VII of the Civil Rights Act of 1964 as amended, and Title I

of the Civil Rights Act of 1991 ("Title VII"). (Doc. No. 61, at 1-2.)  Defendants assert in

their Motion to Dismiss the Second Amended Complaint that the EEOC cannot allege a

1

plausible claim under § 706[1] and § 707[2]. with regard to discriminatory hiring practices, retaliation, or record keeping.

A. Discriminatory Hiring Claim

The EEOC alleges that Defendants have a nationwide standard operating procedure of denying employment to Black and Hispanic applicants for many hourly and salaried positions at their retail stores, because of their race. *Id.* According to the EEOC, Defendants have hired Black and Hispanic applicants at rates far below their availability in the relevant labor pools. *Id.* The EEOC alleges that Defendants' operating procedure of discriminating against minorities emanates from Defendants' top management—specifically, from owner and founder, Johnny Morris. Plaintiff alleges that, in a meeting of Store General Managers in 2004 or 2005, in response to a question concerning racial quotas, Morris said, "this company will never have a quota system because that's not the kind of people I want working in my stores." *Id.* at ¶ 42. The EEOC claims that Defendants' hiring preference for Whites was followed by Store Managers nationwide, and that Managers nationwide were asked to hire applicants who fit "the Profile." *Id.* at ¶ 43-44. Defendants allege that these policies were communicated by corporate Human Resource managers, such as Michael Rowland and Brent Day, to other managers who work for BPOW.

Next, the EEOC provides examples from ten states to establish that BPOW stores are engaging in discriminatory hiring practices nationwide. *Id.* at ¶ 78-125. The EEOC compares the percent of Black and Hispanic employees hired to the percent of Black employees in the respective counties that have BPOW stores. *Id.* at ¶ 126-176; 362-409. The EEOC identifies

---

[1] 42 U.S.C. § 2000e-5 (permitting suit on behalf of a "person or persons aggrieved").
[2] 42 U.S.C. § 2000e-6 (authorizing EEOC to bring suit to remedy a "pattern or practice" of discrimination).

individual Black and Hispanic applicants by name whom Plaintiff claims were denied employment based on their race. *Id.* at ¶ 179 to 361; ¶ 412-429.

B. Retaliation Claim

Second, the EEOC further claims that Defendants have, on a nationwide basis, unlawfully retaliated against employees who opposed practices that they reasonably perceived to violate Title VII. *Id.* Defendants' retaliatory acts against such employees have included, but are not limited to, altering the terms, conditions, or privileges of their employment; bringing false allegations against them; subjecting them to heightened scrutiny; subjecting them to a retaliatory hostile work environment; and firing or constructively discharging them, or otherwise inducing their resignations.

C. Record-keeping claim

The EEOC also accuses Defendants of failing to preserve records relevant to the determination of whether unlawful employment practices have been or are being committed, in violation of Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c). *Id.*

**II. LEGAL STANDARD**

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim for which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). A claim "does not need detailed factual allegations" but must provide a party's grounds for entitlement to relief, "including factual allegations that when assumed to be true raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007), *citing Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007).

A district court will dismiss a claim under Fed. R. of Civ. P. 12(b)(6) only if "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994). However, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1992). A complaint will survive a motion for dismissal only if the plaintiff pleads sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Twombly*, 550 U.S. at 570.

## III. ANALYSIS

### A. Discriminatory Hiring Claim Under § 706

Although Plaintiff's Second Amended Complaint does not differentiate between the § 706 and § 707 claims, the Court will do so. Claims under § 706 and § 707 are distinct pursuant to Title VII, and have differing statutory structures, including the availability of jury trial and equitable remedies.[3]

"A § 706 claim involves the rights of aggrieved *individuals* challenging unlawful employment practices on an individual *or* class-wide basis, whereas a § 707 claim involves a pattern-or-practice of *systemic* discrimination challenging widespread discrimination through a company on a *group* basis." *Scolari Warehouse Mtks., Inc.*, 488 F.Supp.2d at 1143 (citing *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F.Supp. 1059, 1084 (C.D. Ill. 1998); *General Telephone*, 446 U.S. at 324) (emphasis in original). Additionally, "the *Teamsters*

---

[3] In its last Memorandum and Order, which was issued in response to Plaintiff's Amended Complaint, the Court went into great depth as to the differences between § 706 and § 707. Some circuits have chosen to accept "hybrid" claims of 706 and 707 (for example, allowing individuals to bring pattern-and-practice claims.) *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir. 1986); *Davis v. Califano*, 613 F.2d 957, 961-62 (D.C. Cir. 1979). This Court finds that the two claims are separate, and no "hybrid" claim exists. "The 1991 amendments to Title VII expanded the remedies available for § 706 claims from purely equitable remedies, including backpay, to include punitive and compensatory damages, without similarly expanding the damages available for claims brought pursuant to § 707." *JBS USA, LLC*, 2011 WL 3471080, at *4 (citing 42 U.S.C. § 1981 a(a)(1); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 287 (2002)).

framework generally applies to pattern or practice claims brought under § 707, whereas the

*McDonnell Douglas* framework applies to individual claims brought under § 706." *JBS USA,*

*LLC*, 2011 WL 3471080, at *4 (citing *Serrano v. Cintas Corp.*, 711 F.Supp.2d 782, 794

(E.D. Mich. 2010)).

The EEOC has worked diligently to list almost two hundred potential claimants who,

according to Plaintiff, are Black and Hispanic applicants who have been denied employment

by Defendants. The Court recognizes that the Complaint has evolved since Plaintiff filed its

First Amended Complaint, which the Court considered in its last Motion to Dismiss. The

Court finds that the Plaintiff has met the pleading standard articulated in *Swierkiewicz*,

*Twombly*, and *Iqbal*.

The framework for evaluating a Title VII discrimination claim depends on the type of

evidence presented in support of the claim. The first method a plaintiff may use to prove

disparate treatment is direct evidence, defined as "evidence that, if believed, proves the fact

of intentional discrimination without inference or presumption." *Woodhouse v. Magnolia*

*Hosp.,* 92 F.3d 248, 252 (5th Cir.1996). The clearest example of "direct evidence" of

discrimination would be "evidence that can be interpreted as an acknowledgment of

discriminatory intent by the defendant or its agents." *Troupe v. May Dept. Stores Co.,* 20

F.3d 734, 736 (7th Cir.1994); *see also Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1217-

18 (5th Cir. 1995) (analyzing characteristics of direct evidence). Direct evidence in this

context is not the converse of circumstantial evidence. Rather, direct evidence is evidence

"showing a specific link between the alleged discriminatory animus and the challenged

decision, sufficient to support a finding by a reasonable fact finder that an illegitimate

criterion actually motivated" the adverse employment action. *See Moore v. U.S. Dep't of*

*Agric.,* 55 F.3d 991, 995 (5th Cir.1995) (noting that because the plaintiffs presented direct

evidence of discriminatory animus, they "are entitled to bypass the *McDonnell Douglas* burden-shifting framework commonly applied in discrimination cases and proceed directly to the question of liability"). "In the rare situation in which the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of discrimination.' " *Kendall v. Block,* 821 F.2d 1142, 1145 (5th Cir.1987) (quoting *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir.1980)).

The Court considers whether the comment made by Morris could be considered direct evidence of discrimination. Plaintiff alleges that, in a meeting of Store General Managers in 2004 or 2005, Morris answered a question concerning racial quotas by stating "this company will never have a quota system because that's not the kind of people I want working in my stores." (Doc. No. 61, ¶ 42 [SAC].)  Defendants' hiring preference for Whites was known as "the Profile" and Plaintiff provides a few examples in which Human Resources Managers referred specifically to the Profile as a directive to hire White candidates. (Doc. No. 61, ¶ ¶ 48, 50 [SAC].)

Defendants argue that Morris' comment was simply suggesting that quotas are illegal. In *Togerson v. City of Rochester,*643 F.3d 1031, 1044-45 (8th Cir.), the court held there was no discriminatory animus reflected in a city commissioner's statement that he would not have recommended a grant had he known it included a requirement of hiring minorities and women. The Eighth Circuit observed that such a statement was entirely consistent with Title VII. Morris' statement, however, is distinguishable from the city commissioner's statement. In comparing this case to *Togerson,* Defendants ignore the latter part of Morris' statement, in which Morris states he does not want those "kind of people working in [his] stores."

Plaintiff argues that the direct evidence would foreclose summary judgment, and certainly foreclose a 12(b)(6) dismissal. *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 309, 315 (5th Cir. 2004) ("Such comments [direct evidence] preclude summary judgment because a rational finder of fact could conclude that age played a role in Power's decision to terminate Rachid.") The Court agrees with Plaintiff that Morris' statement reflects racial animus. However, the Court disagrees with Plaintiff that such direct evidence forecloses a 12(b)(6) motion. Unlike *Rachid,* Plaintiff has failed to link Morris' comment to the decision to deny any individual claimant a job. If oral statements indicate the speaker's animus, but were not delivered in the specific context of a disputed decision, the words are not considered "direct evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000). Workplace remarks may constitute direct evidence of discrimination if they are "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655 (5th Cir.1996); *Patel v. Midland Memorial Hospital & Medical Center,* 298 F.3d 333, 343-44 (5th Cir.2002), *quoting Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 222-23 (5th Cir.2001). *See also Rubinstein v. Adm'rs of Tulane Educ. Fund,* 218 F.3d 392, 401 (5th Cir.2000), *cert. denied,* 532 U.S. 937 (2001). If the workplace remarks fail to meet these criteria, e.g., if they are vague and remote in time, or the speaker has no authority or influence over the employment decisions, they are merely "stray remarks." *See, e.g., Krystek v. University of Southern Miss.,* 164 F.3d 251, 256 (5th Cir.1999).

The link between the speaker's comment and the disputed decision is most often established through temporal proximity, though if the direct evidence is egregious enough, it

may be able to stand on its own. *See Brown v. East Mississippi Electric Power, Ass'n* 989 F.2d 858 (5th Cir. 1993) (Plaintiff's supervisor routinely called him nigger before he was constructively discharged); *King v. Hardesty,* 517 F.3d 1049 (8th Cir. 2008) (school administrator stated to Plaintiff, an African-American teacher, that "white people teach black kids ... better than someone from their own race.) While this Court finds that Morris' statement displays a discriminatory attitude, it is insufficient to permit a factfinder to conclude that *any* particular employment decision made by BPOW was linked directly to Morris' statement, without further information being provided—for example, information regarding the individual seeking employment, when the employment decision took place, and whether the actor who refused to hire the minority applicant had knowledge of Morris' statement. In both *Brown* and *King*, racist comments had been directed at the plaintiffs, who were subsequently terminated or discharged. Here, there is no specific employment act that resulted from Morris' comment. Thus, Morris' comment does not prove "without inference or presumption" that any particular employment decision was motivated by discrimination, *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005), nor does it show on its face that an improper criterion served as a basis…for the adverse employment action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003), cited by *Gaalla v. Brown*, 460 F. App'x 469, 480 (5th Cir. 2012).

Because the EEOC has not presented direct evidence of discrimination, the court will analyze its claims utilizing the *McDonnell Douglas* burden-shifting framework. This framework requires that the plaintiffs establish that they (1) belong to a protected class, (2) were qualified for the positions from which they were excluded, (3) were subject to an adverse employment action, and (4) were treated less favorably than similarly situated employees. *Bryan v. McKinsey & Co., Inc.,* 375 F.3d 358, 360 (5th Cir.2004). Plaintiff

provides 199 potential claimants who were allegedly denied employment at BPOW.

Defendants argue that Plaintiff has still failed to allege a plausible claim with regard to any individual. In 76 anecdotal accounts involving paper or electronic applications, the EEOC alleges no facts suggesting that BPOW knew the alleged applicant's race.[4] In only 19 of the anecdotes does the EEOC identify the alleged positions that the Black and Hispanic individuals purportedly applied for.[5] For 102 of the individuals, it is not clear whether there was an open position when they applied, and whether another individual was hired for that open position instead.[6] Most significantly, the EEOC identifies the race of the person whom Bass hired in only eight anecdotes, but fails to allege whether these individuals were similarly-situated to the Black or Hispanic applicant whom Plaintiff alleges applied.[7]

At the 12(b)(6) stage, the Court does not require that the Plaintiff plead a prima facie case. Plaintiff must simply plead a plausible claim. In *Swierkiewicz v. Sorema N.A.,* which preceded *Twombly* and *Iqbal,* the Supreme Court rejected a heightened factual pleading requirement. Specifically, the Court held that an employment discrimination complaint need not allege specific facts establishing a prima facie case of discrimination. This Court, in its previous Order, reconciled S*wierkiewicz, Twombly,* and *Iqbal,* stating that a complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, "the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim. *E.E.O.C. v. Bass Pro Outdoor World, LLC*, 884 F. Supp. 2d 499, 515 (S.D. Tex. 2012) (*citing  Moore v. Metropolitan Human Service District*, No. 09-6470, 2010

---

[4] SAC ¶¶ 184-85, 187-89, 191, 196-97, 199, 204, 206, 212, 215-18, 220-21, 225-26, 228, 230-32, 234, 236-37, 240, 243, 245-49, 251-54, 256, 259-63, 265, 267, 272-73, 276, 279-80, 284, 286, 288, 292-93, 301, 306, 313-14, 318, 341, 360-361, 413, 415, 417-23, 426-27. In contrast, the EEOC specifically alleges in other anecdotes that the applicant applied "in person" or was interviewed. See, e.g., SAC ¶¶ 190, 210, 224.
[5] SAC ¶¶ 188, 193, 195, 198, 202, 209, 227, 229, 259, 265, 270, 275, 293, 294, 327, 333, 361, 421, 429.
[6] SAC ¶¶185, 189, 191-92, 194-97, 199-200, 206, 211-12, 215-26, 230-32, 234-37, 240-49, 251-53, 256, 259-63, 267, 273, 279-80, 284, 286, 288, 296, 302, 304-06, 309, 311-14, 318-23, 328-31, 337-41, 343-48, 352, 355, 359-60, 413, 415-18, 420, 422-223, 425.
[7] SAC ¶¶ 184, 238, 257, 270, 272, 274, 287, 427.

WL 1462224, at *3 (E.D. La. April 8, 2010); *Hedges v. Town of Madison*, 456 Fed.Appx. 22, 22 (2d Cir. 2012); *Barbosa v. Continuum Health Partners, Inc.*, 716 F.Supp.2d 210, 215 (S.D.N.Y. 2010); *EEOC v. SDI of Grapevine Texas*, No. 3:08-CV-1606-L, 2009 WL 1469779, at *2 (N.D. Tex. May 27, 2009)).

The Court recognizes that the EEOC has not successfully pled a prima facie case for the named claimants. Plaintiff is missing vital information regarding whether Defendants were aware of a particular claimant's race, whether a position was available when claimant applied, and whether a similarly situated individual was hired in lieu of the named claimant. However, this is precisely the type of information that Plaintiff is likely to obtain through discovery, and the Court finds that Plaintiff has adequately put Defendants on notice regarding the nature of the EEOC's claims. Although Plaintiff has not met the requirements of a prima facie case under *McDonnell Dougla*s, Plaintiff has provided names and details regarding the potential claimants, a description of the discriminatory comments by Morris, and information regarding discriminatory actions and comments by other top-level managers of BPOW. When considered in its totality, the EEOC's § 706 claim is sufficiently pled to survive Defendants' Motion to Dismiss.

**B. Retaliation Claim**

To state a retaliation claim, the EEOC must plead facts showing, either directly or through reasonable inference, (1) protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). The EEOC has identified five individuals on whose behalf it is bringing a retaliation claim: Eric Benitez, Laura Tarr, Denise Marstall,

Velecia Cruse, and Demar Watson.[8] While the Court finds that Tarr and Marstall's claims are insufficient because the EEOC does not allege an adverse employment action, Benitez, Cruse, and Watson have all alleged plausible claims.

### Tarr and Marstell

The EEOC alleges that, after Tarr complained about sexual harassment, she was denied a schedule change, was forced to work with the purported harasser, was denied breaks, and was prevented from taking off Saturdays.[9] Tarr eventually resigned. Similarly, Marstall complained about a wage disparity between male and female leads to the Auburn, New York general manager. The EEOC alleges that, after this meeting, Marstall was written up for absenteeism, her workload increased, her actions were scrutinized, she was denied days off, and her high quality customer service accolades were ignored.[10] Plaintiff alleges that Marstall resigned as a result. However, close scrutiny, denying days off, failing to alter a schedule, or assigning a heavy workload are not considered adverse actions.[11] While it is appropriate to consider the cumulative effect of all the actions alleged, even aggregated, BPOW's responses are insufficient to allege a plausible claim of retaliation.

---

[8] SAC ¶¶ 463-506.

[9] SAC ¶¶ 486-488.

[10] SAC ¶¶ 491-93.

[11] *Grice v. FMC Techs., Inc.*, 216 F. App'x 401, 404, 407 (5th Cir. 2007) (no adverse action in retaliation case where plaintiff alleged she was "watched more closely than others"); *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 441 (5th Cir. 2007) (written warning for insubordination, for being argumentative, and for excessive absenteeism was not an adverse employment action because it would not "have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (quotation and citation omitted); *Soublet v. Louisiana Tax Comm'n*, 766 F. Supp. 2d 723, 735 (E.D. La. 2011) ("plaintiff's complaints of increased or altered supervision, criticism and documentation, even when considered together, would not dissuade a reasonable worker from making or supporting a charge of discrimination"); *Lara v. Kempthorne*, 673 F. Supp. 2d 504, 518-19 (S.D. Tex. 2009) (failure to approve plaintiff's request for vacation leave was not materially adverse and would not dissuade a reasonable employee from making or sustaining a discrimination complaint). *Griffin v. Citgo Petroleum Corp.*, 344 F. App'x 866, 868 (5th Cir. 2009) (purported denial of plaintiff's transfer to a different unit after making a sexual harassment complaint against her supervisor did not constitute a materially adverse employment action for a retaliation claim because the transfer denial did not affect plaintiff's employment status, benefits, or responsibilities); *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009) (no adverse action where plaintiff's personal belongings were taken from her desk, she could not shut her door because locks were changed, she was chastised and ostracized by her co-workers and supervisors, and she was assigned a heavier workload);

The Court evaluates the EEOC's request for leave to amend under Federal Rule of Civil Procedure 15, which provides that this Court "should freely give leave when justice so requires." *Cole v. Sandel Med. Indus., LLC.,* 413 Fed.Appx. 683, 688 (5th Cir.2011) (quoting Fed.R.Civ.P. 15(a)(2)). In considering whether to grant leave to amend, the Court may weigh multiple factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice, and futility. *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir.1993). Although this is the EEOC's third opportunity to submit an amended complaint, the Court finds that affording the EEOC one more opportunity to plead Tarr and Marstall's claims is appropriate.

**Benitez**

Benitez, who is Cuban-American, worked for Defendants as a Service Tech from 2007 until he was terminated in 2011. Benitez was terminated after he complained several times about a co-worker's discriminatory remarks.  The EEOC alleges that, although Benitez had more seniority, a White co-worker, William, was promoted to the Service Manager position. William also used racial slurs, like "Spic," towards Benitez and the other Cuban-American employees.[12] Plaintiff alleges that Benitez complained several times about William's behavior to the Store Manager, Scott Tarlow, and to other managers.[13] Plaintiff has not provided the precise dates on which he made his complaints, except for his last complaint, regarding "other problems" he was having with William, which Benitez made in writing to Human Resources in early 2011. Within several weeks of Benitez's last complaint, BPOW fired him.[14] The EEOC alleges that his termination was based on a false accusation brought against him by William.

---

[12] SAC ¶¶ 502-506
[13] *Id.*
[14] *Id.*

BPOW argues that the timing of all of Benitez's complaints is unspecified as to temporal proximity, and thus Plaintiff cannot prove that the protected activity was causally linked to Benitez's termination. The Court, however, finds that Plaintiff has a plausible claim of retaliation regarding Benitez's termination. Plaintiff presents evidence that Benitez filed a number of complaints, including a written complaint just weeks before being terminated. Plaintiff has alleged sufficient facts to survive the 12(b)(6) motion, and is entitled to discovery to develop further proof—including the dates and exact nature of Benitez's complaints.

### Cruse

Cruse, a Black female, had many years of human resources experience when Defendants hired her. When Cruse started working at Defendants' Katy, Texas store, she noticed discriminatory practices including Black applicants being rejected even when they were more experienced than the White applicants, Black employees being assigned to undesirable shifts, and Black applicants given a test that White applicants did not have to take.[15] Cruse complained of the discriminatory practices to the Katy Store General Manager, Regional Human Resources Manager, and the Director of Human Resources. Once she started complaining, management retaliated against her by scrutinizing her work more intensely and assigning her undesirable work hours.[16] In July 2009, Cruse complained about the retaliation. Shortly after, Regional Human Resources Manager visited the Katy Store and accused Cruse of payroll irregularities.[17] Defendants fired Cruse within eight days of receiving notice of her retaliation complaint.

---

[15] SAC ¶ 496.
[16] SAC ¶ 498.
[17] SAC ¶¶ 500-501.

Defendants argue that being assigned undesirable work hours and having one's work scrutinized are not adverse actions. However, Cruse's complaints about the discrimination are protected acts, and her termination is an adverse action. Defendants also allege that Plaintiff has not identified the date of Cruse's complaint. Although Plaintiff has not identified the specific date, it has provided sufficient evidence of temporal proximity—that there were eight days between Cruse's last complaint and her termination. Plaintiff is entitled to use discovery to develop its facts further and supply the Court with more precise dates on Cruse's termination. Plaintiff's retaliation claim with regard to Cruse survives Defendants 12(b)(6) motion.

**Watson**

Plaintiff alleges that Defendants retaliated against Demar Watson[18], Store Human Resources Manager at the Bossier City, Louisiana store, for engaging in protected activity. After Watson opposed other managers' unlawful discrimination, participated in EEOC's investigation, and was involved in an internal investigation of the Bossier City store, Defendants wrote Watson up (June 2008) and gave him a negative performance evaluation (March 2009).[19] The evaluation noted, "The EEOC investigation was a disaster."[20] After Watson terminated an employee in August 2011 for making derogatory comments and threats about race, sex, and age concerning another employee, BPOW terminated Watson in retaliation on September 7, 2011.[21]

Defendants argue 1) the write-up in 2008 is not an adverse action, 2) the performance evaluation in 2009 was over a year after the EEOC investigation and Watson's initial

---

[18] Although neither side discusses Watson's race or ethnicity, the Court is willing to assume, solely for purposes of the pending motion, that he is within a protected class.
[19] SAC ¶¶ 470-75, 484.
[20] *Id.*
[21] *Id.*

complaints, 3) Watson was disciplined because he mishandled the EEOC investigation, not because he participated in it, and 4) BPOW accepted Watson's recommendation and ordered termination of the employee making derogatory comments and threats.

Even if the write-up of Watson in 2008 is not an adverse action, it is logical and appropriate to consider the cumulative effect of all retaliatory actions rather than compartmentalizing them and evaluating them individually. *See, e.g., Sandres v. State of La.,* 2010 WL 3782122, at *9 (M.D.La. Sept. 3, 2010) ("a reasonable jury could find that all of the acts alleged by the plaintiff collectively could dissuade a reasonable worker from making or supporting a charge of discrimination"); *Moore v. Cricket Communications, Inc.*, 764 F. Supp. 2d 853, 862 (S.D. Tex. 2011); ("To hold otherwise would prevent remedies for retaliation in the form of "death by a thousand cuts," and would ignore the context-specific nature of the standard articulated in *Burlington Northern"*); *Devin v. Schwan's Home Serv., Inc.,* 491 F.3d 778, 787–88 (8th Cir.2007) ("Nothing in *White* precludes this court from considering an employer's actions cumulatively when determining whether a reasonable employee would be dissuaded from making a discrimination claim."); *Sanford v. Main Street Baptist Church Manor, Inc.,* 327 Fed.Appx. 587, 599 (6th Cir.2009) ("while some of the incidents alone may not rise to the level of an adverse employment action, the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge"); *Apodaca v. Chertoff,* 161 Fed.Appx. 897, 900 (11th Cir.2006) ("In determining whether an adverse employment action occurred, the cumulative effect of several individual actions may be considered.") Defendants concede that Watson's performance evaluation that resulted in lower pay, participation in the EEOC investigation, and eventual termination would be considered adverse actions. Defendants argue that Watson's poor performance evaluation was too long after his participation in the EEOC investigation to be causally

linked. However, this is a conclusion not supported by the facts. Watson's performance

evaluation specifically referenced the EEOC investigation.

Additionally, the Court must "accept the complaint's well-pleaded facts as true and

view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503,

529 (5th Cir. 2004). When the evaluation noted, "The EEOC investigation was a disaster," it

can be read as Defendants wish, but it can also be read to mean that Watson was chastised for

his participation in the EEOC investigation. Thus, the Court finds that Plaintiff has alleged

facts sufficient to proceed on Watson's claim.

**C. Discriminatory Hiring Claim Under § 707**

"Under § 707, the EEOC may investigate and act on a charge of a pattern or practice

of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a

member of the Commission." *EEOC v. Princeton Healthcare System,* No. 10–4126(PGS),

2012 WL 1623870, at *16 (D.N.J. May 9, 2012) (citing 42 U.S.C. § 2000e–6(a)–(e)). To

prevail, plaintiffs must demonstrate more than "the mere occurrence of isolated or

'accidental' or sporadic discriminatory acts. [Rather they must show] by a preponderance of

the evidence that discrimination was the [defendants'] standard operating procedure—the

regular rather than the unusual practice." *International Brotherhood of Teamsters v. United

States,* 431 U.S. at 336, 97 S.Ct. at 1854.

In Plaintiff's former complaint that was considered by this Court, Plaintiff fell short

of the pleading requirement, arguing that, of the 600 managers at Defendants' retail stores,

only about 10 to 15 were Black. *E.E.O.C. v. Bass Pro Outdoor World, LLC*, 884 F. Supp. 2d

499 (S.D. Tex. 2012). This Court noted that, while such evidence might be enough to allege a

plausible claim with regard to Black managers, it was insufficient to support a claim that

Defendants had a nationwide standard operating procedure of discouraging the hiring of

Black applicants. *Id.* Plaintiff has worked diligently to amend its complaint, and now

provides statistical information reflecting the disparity in Black and Hispanic hires—beyond

managerial positions—as well as anecdotal evidence of a pattern or practice of discrimination

by Defendants.

Defendants argue in their Motion that the combination of Plaintiff's individual,

statistical, and anecdotal evidence in the SAC is still insufficient to withstand a 12(b)(6)

motion. The Court disagrees. Even though the statistical analysis employed in the SAC may

be insufficient to establish a 707 claim *on its own,* it should be considered in conjunction

with the other evidence presented by Plaintiff. A prima facie case of disparate treatment may

be established by the use of statistics if a "gross" disparity in the treatment of workers based

on race is shown.[5] *See Hazelwood School District v. United States,* 433 U.S. 299 (1977).

Gross statistical disparities, standing alone, may justify an inference of discriminatory

motive. *See Payne v. Travenol Laboratories, Inc.,* 5 Cir.1982, 673 F.2d 798, 817; *Williams v.*

*New Orleans Steamship Association,* 5 Cir.1982, 673 F.2d 742, 749. However, even if the

statistical evidence does not demonstrate a "gross" disparity, it may still be probative. "The

statistical showing of disparate result may also be buttressed with evidence of a history of

discrimination practiced by the employer, individual instances of discrimination, and

opportunities to discriminate in the employer's decision-making processes. If the statistical

disparity is insufficient alone to establish a prima facie case, the plaintiff may get over his or

her initial hurdle by combining statistics with historical, individual, or circumstantial

evidence. *See Payne,* 673 F.2d at 817. Thus, the Court considers the EEOC's statistics in

conjunction with the other evidence they have presented.

The Court recognizes that statistical information must be analyzed with the particular

context of the case in mind. For example, in *Teamsters,* plaintiffs compared the percentage of

Black line drivers to the percentage of Blacks in the general population of various cities. 431 U.S. at 337. However, in *Hazelwood*, plaintiffs alleged racial discrimination in teacher hiring in a public school district. Their statistical evidence compared the percentage of Black teachers hired by the district with the percentage of Blacks in the geographical area. The Court held that the proper population encompassed only those Blacks qualified as teachers and that plaintiffs' suggested population had little probative value in the context of the claim asserted. In short, statistics must be meaningful—"their usefulness depends on all of the surrounding facts and circumstances." *Teamsters*, 431 U.S. at 340.

Defendants argue here that the statistical evidence should be disregarded because it is not applicant flow data. If provided, flow data would measure the percentage of all applicants actually hired to establish the expected outcome. For example, if 1000 people applied and 100 were applied, then the overall hiring rate would be 10%. With neutral hiring, the expected hiring rates for all classes would be 10%. Applicant flow can sometimes be a more accurate measure of an employer's hiring practices than general population comparisons when, for example, a greater percentage of qualified Blacks apply for work than qualified whites. *Payne v. Travenol Laboratories, Inc*., 673 F.2d 798, 824 (5th Cir. 1982). However, applicant data "is frequently unavailable, and, when available, it is often distorted by inadequate or excessive recruiting efforts, improper deterrence of applicants, unqualified applicants, multiple applications by the same applicant, or lack of specificity or improper groupings." *Wheeler v. City of Columbus, Miss.*, 686 F.2d 1144, 1152 (5th Cir. 1982). Furthermore, while applicant data might be relevant, "(t)he absence of such evidence, however, will not prevent plaintiffs from recovering." *Wilkins v. University of Housto*n, 654 F.2d 388, 396 (5th Cir. 1981). Taking Plaintiff's facts as true, most positions at BPOW

require no formal training.[22] Thus, the percentage of minorities in the county can be compared to the percentage within the relevant store to provide reliable statistical data regarding Defendants' hiring practices, at least at the 12(b)(6) stage. Defendants argue that the relevant labor market must be drawn from the area in which each specific store draws its applicants. However, in light of Plaintiff's allegations that job fairs for specific stores are intentionally held in areas with fewer minorities,[23] the county data—particularly at this stage of the proceedings—will suffice.

The EEOC was provided hiring data for the aforementioned 24 of 56 Defendants' retail stores. According to that data, 23 (95.8%) of the 24 stores hired a percentage of Black employees lower than the percentage of Black employees in the county in which the store is located, as provided for in the Census 2000 Special EEO file. SAC ¶ 130. Also, according to that hiring data, 17 (70.8%) of the 24 stores hired a percentage of Hispanic employees lower than the percentage of Hispanic employees in the county in which the store is located. SAC ¶ 364. The year-by-year employment data from 2007 to 2010 for each store regarding total employment, sales positions and managerial positions show that there were 186 instances in which no Blacks were employed in sales or managerial positions at the store and 214 instances in which no Hispanics were employed in sales or managerial positions at the store. Thus, Defendants repeatedly achieved 400 "inexorable zeroes" in employing Blacks and Hispanics at certain stores, as decried by the Supreme Court in *Teamsters*, 431 U.S. at 342. Comparing the number of Black employees hired to the representation rate of Black employees in the county in which each store is located indicates that Defendants had an aggregate net shortfall of 1,097 Black employees and 187 Hispanic employees. SAC ¶¶ 131,

---

[22] SAC ¶¶ 64, 66.
[23] SAC ¶59.

365. According to Defendants' 2007 EEO-1 reports, out of a total employment of 8,186 employees in 43 retail stores, only 365 (4.5%) employees were Black. SAC ¶ 132. According to the hiring data for 24 of Defendants' retail stores that Defendants produced to the EEOC during the administrative investigation, out of a total 14,374 employees hired during the relevant time period, only 1,207 (8.4%) of the hires were Hispanic. SAC ¶ 363. Plaintiff is not required to engage in a full statistical analysis in the Complaint, and the Court finds that the SAC sets forth well-pleaded facts supporting the claim of systemic hiring discrimination against Blacks and Hispanics.

Defendants also allege that Plaintiff has only alleged four instances in three stores where "the Profile" was purportedly tied to race. While "the Profile" is not explicitly mentioned in all of Plaintiff's anecdotes, Plaintiff has listed ten stores across the nation, where managers displayed conduct towards Blacks and Hispanics that adheres to the Profile and tolerates discriminatory conduct in the store.[24] These anecdotal accounts, considered

---

[24] *See* Doc. No. 61, SAC ¶ 80-84 (describing how the Bossier City, Louisiana store aggressively enforced the Profile, the Store General Manager instructed the customer service manager not to hire any more Blacks, the customer service manager objected to a Black applicant because the "Bubba Clientele" would be prejudiced against her); SAC ¶ 85-86 (the Concord, Iowa store directed that all hiring had to be done by the Profile, regional manager explained that Black employee did not fit the Profile, restaurant manager who complained about directive was fired); SAC ¶ 87-92 (the Katy, Texas store General Manager called Black employees "lazy, pimps, and Monkeys" and Hispanics "wetback, vato, spic, Pedro, and Mexican," and made comments to human resources stating that "it was getting a little dark…you need to hire some White people." Black applicants had to take a specialized exam that White applicants did not.); SAC ¶ 93-104 (Job fairs located in predominantly white areas, though the store is located in a more integrated area, HR Manager stated "we just kick out the Black applicants at a much higher rate than we do the White applicants who have less outdoor experience," Black employees were called racial slurs.); SAC ¶ 105-109 (Charlotte, North Carolina store screened out applicants if they didn't fit the "demographics," Defendants took no action when lone Black manager's store identification card was defaced with "nigger."); SAC ¶ 93-104 (a White BPOW employee at Hampton, Virginia told a Black applicant "niggers aren't allowed to work here."); SAC ¶ 111-114 (General Manger in Broken Arrow, Oklahoma sarcastically criticized a Restaurant General Manager, stating "you got enough niggers hired yet?," also criticized the Assistant General Manager for hiring Hispanics, stating that he was hiring the "Rio Grande Express."); SAC ¶ 115-120 (Clarksville, Indiana Loss prevention agent discarded employment applications because applicant's name "sounded like a 'nigger' name," and applied the Profile to the sales floor, claiming that minorities "didn't fit the profile of what we want in the store…they look like they are from the projects across the street."); SAC ¶ 121-125 (Leeds, Alabama store recruited only white loss prevention agents, Spanish Fort Alabama store employee called two Black employees "worthless niggers," the complaint regarding the slur was never investigated, HR manager at the same store instructed all department managers that "you can't hire all blacks.").

with the 200 or so individual applicants who were denied employment at BPOW, combined with the statistical data, are sufficient to survive the Motion to Dismiss.

**D. Record Keeping Violation**

Plaintiff alleges that Defendants have failed, in violation of Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), to preserve records relevant to the determination of whether unlawful employment practices have been or are being committed. This Court found Plaintiff's record-keeping claim well-pled in the last Order considering this matter. *Bass Pro;* 884 F. Supp. 2d at 522 (S.D. Tex. 2012). In Defendants' Motion to Dismiss, Defendants presents no new arguments, rather Defendants simply incorporate previous arguments to preserve and not waive them.  Thus, the record-keeping claim will not be dismissed.

**E. Statute of Limitations and Jury Trial**

Defendants argue that any claims based on acts occurring outside the Title VII Statute of Limitations are time-barred. As this Court previously ruled, the 300 day period applies to all of the EEOC's claims, whether they are brought under § 706 or § 707. *Id.*at 523. The Court excludes these claims, except where they provide background information. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (noting that a plaintiff may use the facts underlying a time-barred claim "as background evidence in support of a timely claim."

Defendants also argue that allowing one jury to oversee individualized hearings for the 100+ class members spread throughout the country is impracticable. Furthermore, Defendants argue that bifurcation of the proceeding is constitutionally prohibited as it would violate the Due Process clause and the Seventh Amendment. The question of case manageability, while important, does not foreclose any of Plaintiff's claims under 12(b)(6). The Court reserves judgment on the procedure—including possible bifurcation—that would

be used in the event of a trial, and whether that would violate Defendants' constitutional rights

## IV. CONCLUSION

The Court finds that the EEOC's § 706 discriminatory hiring claim, § 707 pattern-or-practice, and record-keeping claim survive Defendants' 12(b)(6) Motion. The Court finds that Plaintiff's retaliation claims regarding Cruse, Benitez, and Watson survive the motion. However, the Court grants Defendants' Motion with regard to Tarr and Marstall. Plaintiff is given leave to amend its Complaint with regard to Tarr and Marstall's retaliation claims, and must do so within fourteen days of this order. Thus, Defendants' Motion is **GRANTED in part and DENIED in part.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 18th day of March, 2013.

**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**