### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | § | |
| **OPPORTUNITY COMMISSION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 4:11-CV-3425** |
| | § | |
| **BASS PRO OUTDOOR WORLD, LLC,** | § | |
| **and TRACKER MARINE, LLC** | § | |
| | § | |
| **Defendants.** | § | |

### <u>MEMORANDUM AND ORDER</u>

Plaintiff Equal Employment Opportunity Commission ("the EEOC" or "the Commission") has brought suit against Defendants Bass Pro Outdoor World, LLC, and Tracker Marine, LLC ("Defendants" or "Bass Pro"), for violations of Title VII of the Civil Rights Act of 1964. The Commission has alleged that Defendants are guilty of pervasive discrimination against minority applicants and employees. It seeks significant monetary damages and comprehensive prospective relief. Two Motions are currently before this Court: Defendants' Motion for Summary Judgment (Doc. No. 119) and Plaintiff's Motion to Amend the Complaint (Doc. No. 135.) Most pressing is Defendants' Motion: Bass Pro asks the Court to dismiss the case on the grounds that the Commission has failed to engage in good-faith conciliation. (Doc. No. 119 at 1.) This is just the sort of motion that should make courts uneasy: armed with enormous discretion, the Court is asked, on what is now a cold record, to evaluate whether an independent agency undertook settlement talks in good faith. It is in these situations where we risk "aggrandizement of one branch at the expense of the other." *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)

Nevertheless, as the Court explained in its October Memorandum & Order, there is no doubt that, in this circuit and most others, it is the province and the duty of the judiciary to pass on the Commission's attempts to conciliate.  (*See* Doc. No. 149.)  For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  It is denied insofar as Defendants seek dismissal.  However, because the Court believes the Commission prematurely terminated its efforts to conciliate the claims under § 706, the Court implements a thirty-day stay, and it dismisses any complainants who did not apply to work for Bass Pro until after the Commission issued its Letter of Determination.  As for Plaintiff's Motion to Amend, that motion is **GRANTED**.  Tracker Marine, LLC is **DISMISSED WITHOUT PREJUDICE**.

## I.     BACKGROUND

In deciding this Motion, it is necessary to take a close look at how the Commission and the Defendant interacted during the course of conciliation.  As appears to be the norm, the parties "engaged in a vociferous letter-writing campaign" for more than six months.  *EEOC v. Bloomberg L.P. (Bloomberg II)*, 751 F. Supp. 2d 628, 640-41 (S.D.N.Y. 2010).  They also met face-to-face.  For reasons explained below, the Court looks separately at the Commission's attempt to conciliate its § 707 claim and its § 706 claims and thus discusses the facts relevant to each, in the course of its analysis.  Still, a brief overview here at the outset should help to set the scene.

### A.  Factual Background

The EEOC issued a Commissioner's Charge on February 20, 2007, indicating that the commissioner "ha[d] reason to think" that Bass Pro "ha[d] since at least November 2005[] discriminated against African American applicants and employees on the basis of their race at

Bass Pro Shops' retail stores and facilities nationwide."  (Doc. No. 119-4 at 2.)  The EEOC issued an Amended Commissioner's Charge on May 5, 2008, adding that female, Asian, and Hispanic applicants and employees had also been subject to discriminatory hiring practices. (Doc. No. 119-5 at 2-4.)   The Amended Charge outlined ten distinct allegations, including "failing to recruit and/or hire" African American, female, Asian, and Hispanic applicants, "[u]tilizing recruiting, hiring, and promoting policies and/or practices which adversely impact African American or black employee or applicants' ability to obtain positions in its retail stores," and "[h]arassing and retaliating against employees who have opposed discriminatory employment practices."  (*Id.* at 2-3.)

The EEOC's investigation then commenced.  Over the course of three years, the parties exchanged numerous letters, met at least three times, and Bass Pro responded to seven requests for production and produced over 230,000 pages of documents, (Doc. No. 119-6 at 3).   The parties exchanged their first settlement proposals during the course of the investigation, but from the start, they were many million dollars apart. (Doc. No. 136-3 at 4-5.)

The Commission finally issued its Letter of Determination on April 29, 2010.  (Doc. No. 119-11 at 2.)  That letter meant in effect that the Commission believed it had unearthed good cause to believe the allegations made in the initial Charge (and Amended Charge) were true.  In fact, that document listed more or less the same allegations as those contained in the Amended Commissioner's Charge.  (*Id.* at 2-4.)

The Commission contacted Bass Pro on May 5, 2010 to begin the conciliation process and set up an in-person meeting.  (Doc. No. 119-14.)  The Commission noted that it would "welcome [Bass Pro's] submission of a conciliation proposal prior to our scheduled meeting." (*Id.* at 2.)  This is when the pace of the letter-writing campaign accelerated.  The record reflects

that, over the course of the next eight months, the parties exchanged a total of nineteen letters. They also met in Dallas on August 4, 2010.  After months of discussion marked by Bass Pro asking for more and more information, the Commission consistently refusing to provide all that the employer was seeking, and settlement offers, at least monetary ones, that reflected a fundamental disagreement, the Commission decided on November 19, 2010 that conciliation had failed.

Even then, the parties continued to exchange a handful of letters, ostensibly resuming conciliation talks, but neither side seriously changed its position.  The Commission once again asserted in April 2011 that it did not appear as though conciliation or settlement talks would be fruitful and informed Bass Pro that it was considering filing suit.  (Doc. No. 120-9 at 2.)

### B.  Procedural Background

This suit was filed on September 21, 2011.  (Doc. No. 1.)  The original complaint, just nine pages long, alleged a "pattern or practice of unlawfully failing to hire Black and Hispanic applicants" and unlawful retaliation against individuals who opposed Bass Pro's practices.  *Id.*

The Commission filed an Amended Complaint in January 2012, adding two related legal entities as defendants.  (Doc. No. 23.)  Defendants moved to dismiss and this Court granted in part and denied in part, explaining:

> The Court concludes that the EEOC has failed to state a claim for a pattern or practice of discrimination.  Likewise, the EEOC's retaliation claim cannot survive the Motion to Dismiss.  The Court agrees with Defendants that the EEOC may not bring a pattern or practice claim pursuant to § 706.  A 300-day limitations period applies to claims brought pursuant to § 706 or § 707; therefore, claims for failure to hire falling outside of that time period must be dismissed.  The EEOC has adequately pleaded a record-keeping violation and that conditions precedent to the lawsuit have been met.

(Doc. No. 53 at 9; *see also EEOC v. Bass Pro Outdoor World, LLC (Bass Pro I)*, 884 F. Supp. 2d 499, 509 (S.D. Tex. 2012).)

4

The Commission once again filed an amended complaint, one that ballooned from twelve pages to 247.  (*See* Doc. No. 61.)  For the first time, it described its allegations in great detail, including descriptions of many of the individuals on whose behalf it was pressing claims. Defendants filed another motion to dismiss.  One legal entity, Bass Pro, Inc., was dismissed in October 2012.  (Doc. No. 95.)  Then, in March 2013, the Court again granted in part and denied in part Defendants' Motion to Dismiss, with all but two retaliation claims surviving.  (Doc. No. 99; *see also EEOC v. Bass Pro Outdoor World, LLC (Bass Pro II)*, No. 4:11-CV-3425, 2013 WL 1124063 (S.D. Tex. Mar. 18, 2013).)  The Court granted leave to amend, which the Commission timely did, filing a Third Amended Complaint in April 2013.  (Doc. No. 104.)

The parties then both filed motions for summary judgment: the Defendant filed the Motion now before the Court, asking for dismissal for failure to conciliate (Doc. No. 119), and Plaintiff filed a Motion for Partial Summary Judgment, urging that the sufficiency of its attempt to conciliate is not subject to judicial review (Doc. No. 137.)  The Court has already denied that motion.  (Doc. No. 149; *see also EEOC v. Bass Pro Outdoor World, LLC (Bass Pro III)*, No. 4:11-CV-3425, 2013 WL 5515345 (S.D. Tex. Oct. 2, 2013).)  The Commission has also filed a Motion to Amend the Third Amended Complaint on the grounds that Tracker Marine Retail, LLC, and not Tracker Marine, LLC, is a proper defendant.  (Doc. No. 135.)

The Court heard argument on Defendants' Motion for Summary Judgment and Plaintiff's Motion to Amend in November.

## II.    LEGAL FRAMEWORK

### A.  Summary Judgment Standard

To grant summary judgment, the Court must find that the pleadings and evidence show that no genuine issue of material fact exists, and thus that the movant is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56.  The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997).  If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial.  *Id.*  "Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party."  *Nichols v. Enterasys Networks, Inc.,* 495 F.3d 185, 188 (5th Cir. 2007).  Where "the disputed issue in [a] case is purely legal, it [is] appropriately resolved through summary judgment."  *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1065 (5th Cir. 1995).

### B.  Conciliation

As the Court explained in *Bass Pro III*, Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Congress has empowered the EEOC to prevent employers from engaging in such practices.  *See id.* § 2000e-5.  Conciliation is "the preferred means of achieving the objectives of Title VII."  *EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 468 (5th Cir. 2009) (internal quotation marks omitted).  The Act therefore mandates that, after the EEOC has investigated a charge of discrimination and determined that "there is reasonable cause to believe that the charge is true," the Commission "shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."  42 U.S.C. § 2000e-5(b).  The EEOC can file suit only after it has engaged in this "most essential function[]."  *EEOC v. Pet, Inc., Funsten Nut Div*., 612 F.2d 1001, 1002 (5th Cir. 1980).

When courts are asked to determine whether the EEOC has fulfilled its obligation to conciliate, the heart of the inquiry is whether the EEOC made a "good-faith attempt at conciliation." *Agro*, 555 F.3d at 468.  To enforce that requirement, the Fifth Circuit has annunciated a three-part process in which it requires the Commission to engage: "(1) outline to the employer the reasonable cause for its belief that Title VII has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer." *Id.* (citing *EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir. 1981)).  Still, "the fundamental question is the reasonableness and responsiveness of the EEOC's conduct under all the circumstances. *Klingler*, 636 F.2d at 107 (citing *Marshall v. Sun Oil Co. (Delaware)*, 605 F.2d 1331, 1335-36 (5th Cir. 1979)).

Indeed, the reasonableness of the Commission's response depends in part on the degree to which the employer is willing to engage in the process.  Courts "must evaluate one party's efforts with an eye to the conduct of the other party." *Sun Oil*, 605 F.2d at 1335.  The EEOC is justified in dealing with "intransigent" employers differently than it would "repentant" wrongdoers. *Id.*  Employers that do not appear willing to meaningfully interact with the EEOC are entitled to less flexibility from the Commission.  *See id.* at 1336-37 ("Sun's conduct precluded meaningful conciliation despite the Secretary's efforts.  Sun officials never attempted to rebut any of the Secretary's charges except to plead a lack of discriminatory intent or to deny any wrongdoing.  Sun could have countered the Secretary's allegations in a number of ways.").

It has been generally agreed that conciliation requires outlining the basis of the charge, but does *not* require a minitrial.  The EEOC is obligated to "present a reasonable showing of discrimination," but need not "produce as much evidence as [it] would need to prevail at trial, to satisfy the alleged wrongdoer or to meet some nonexistent burden of proof." *Id.* at 1335; *see*

*also EEOC v. McGee Bros. Co., Inc.*, No. 3:10-CV-142-FDW-DSC, 2011 WL 1542148, at *4 (W.D.N.C. Apr. 21, 2011) (explaining that, even under more exacting standard of review applied in the Fifth Circuit, there is no "requirement that the EEOC prove its case during the conciliation period"); *Bloomberg II*, 751 F. Supp. 2d at 639 ("'[T]he EEOC is not required to disclose all of the underlying evidence . . . to the employer.'" (quoting *EEOC v. Hibbing Taconite Co.*, 266 F.R.D. 260, 274 (D. Minn. 2009)). Still, the EEOC must share *some* of its proof. "The EEOC cannot expect employers to make substantial offers of settlement when they are provided with no information with which to evaluate their liability." *EEOC v. La Rana Hawaii, LLC*, 888 F. Supp. 2d 1019, 1045 (D. Haw. 2012).

If the Court determines that the EEOC "prematurely terminated negotiations," it should impose a stay as provided for by the statute; if, on the other hand, it determines that the EEOC "fail[ed] to act in good faith, dismissal remains an appropriate sanction." *Agro*, 555 F.3d at 469 (citing *Klingler*, 636 F.2d at 107). Courts are generally hesitant to resort to dismissal. In *Klingler*, the court of appeals determined that summary judgment-stage dismissal would be "too harsh a sanction," in light of the fact that the EEOC had negotiated with defendant for two years. *Klingler*, 636 F.2d at 107. Without "grossly arbitrary and unreasonable conduct or substantial prejudice to the defendant, that [was] enough evidence of the EEOC's good faith to make such a harsh remedy unnecessary." *Id.* (citations omitted); *see also Bloomberg II*, 751 F. Supp. 2d at 643 ("Ordinarily, when the EEOC has failed to meet its duty to conciliate, the preferred remedy is not dismissal but instead a stay of the action to permit such conciliation. But when the EEOC fails to conciliate in good faith, courts have dismissed cases on that basis." (internal quotation marks omitted)).

III. **DISCUSSION**

**A. Must the EEOC Separately Conciliate Claims Under Sections 706 and 707?**

When the Court resolved Defendants' most recent Motion to Dismiss, it explained that

Although Plaintiff's Second Amended Complaint does not differentiate between the § 706 and § 707 claims, the Court will do so. Claims under § 706 and § 707 are distinct pursuant to Title VII, and have differing statutory structures, including the availability of jury trial and equitable remedies.

"A § 706 claim involves the rights of aggrieved *individuals* challenging unlawful employment practices on an individual *or* class-wide basis, whereas a § 707 claim involves a pattern-or-practice of *systemic* discrimination challenging widespread discrimination through a company on a *group* basis." [Citations.] Additionally, "the *Teamsters* framework generally applies to pattern or practice claims brought under § 707, whereas the *McDonnell Douglas* framework applies to individual claims brought under § 706." [Citations.]

*Bass Pro II,* 2013 WL 1124063, at *2. Thus, the first question that the Court must answer is this: was the EEOC obligated to separately conciliate for its § 706 and § 707 claims? Or, at least, must the Court undertake distinct analyses of whether the Commission properly conciliated the § 706 claim and the § 707 claim? Bass Pro insists that the answer to at least one of those questions is yes.

First principles of EEOC conciliation suggest that Bass Pro is correct. As stated above, the EEOC is obligated to share at least some information about how the EEOC would go about proving its case. *See, e.g.*, *La Rana Hawaii*, 888 F. Supp. 2d at 1045. And since the Commission would prove a case under § 706 differently from a case under § 707, it follows logically that the Court may need to separately analyze the EEOC's conciliation attempts for each type of claim.

Case law counsels in favor of the same result. Indeed, some courts have express;y required the EEOC to tailor its conciliation attempts to the specific type of claims that it has brought. In an exhaustive opinion issued last fall, Chief Judge Loretta Preska of the Southern

District of New York explained that, because "Section 706 and 707 claims are based on distinct theories and are adjudicated under different standards," "[a]llowing the EEOC to subvert its pre-litigation obligations with respect to individual claims by yelling far and wide about class claims would undermine the statutory policy goal of encouraging conciliation." *EEOC v. Bloomberg L.P. (Bloomberg III)*, — F. Supp. 2d —, No. 07 CIV. 8383 LAP, 2013 WL 4799150, at *7 (S.D.N.Y. Sept. 9, 2013).  Further, as discussed at greater length below, some courts have held that "individualized conciliation" is required.  *See, e.g.*, *Arizona ex rel. Goddard v. GEO Grp., Inc.*, No. CV 10-1995-PHX-SRB, 2012 WL 8667598, at *14 (D. Ariz. Apr. 17, 2012) ("The Court considers this to be one reason why individualized conciliation may not be required for section 707 claims, but is required for section 706 claims.  . . . Where retrospective relief is sought, including emotional distress damages as sought here, 'then it follows that there must be some discussion of the merits of individual cases.'" (internal citation omitted)).  That each § 706 claimant's case must be subject to individualized conciliation necessarily implies that a § 707 claim would also require its own distinctive effort at conciliation.

The EEOC has failed to persuade the Court that it need not undertake distinct analyses of § 706 conciliation and § 707 conciliation.  The Commission argues that "[t]here is no statutory requirement that the EEOC separately conciliate based on the legal theories that it would use to prove its case in court."  (Doc. No. 136 at 30.)  This of course is true, but — for better or for worse — so much of what it means to adequately conciliate has been supplied by courts.  That the statute does not expressly mandate claim-by-claim conciliation does not, by itself, indicate that no such duty exists.  The EEOC also argues that its "conciliation efforts in this case pre-date, by several years, this Court's orders regarding the separation of its hiring claim into a '706 claim' and a '707 claim.'"  (*Id.* at 30 n.82.)  This too is a true statement, but not a particularly

persuasive argument.  Courts have long understood there to be a difference between the two sorts of claims, as the EEOC should know better than anyone, and the Commissioner's Charge in this case cited both code sections, indicating that the EEOC has long had some idea that it would be asserting both types of claims, (*see* Doc. No. 119-5 at 2).

Still, the Court wants to be clear that it is not suggesting that the EEOC must hold § 706 meetings and § 707 meetings, send § 706 letters and § 707 letters, and tell an employer during the course of negotiations whether each and every comment is a § 706 remark or § 707 remark. Conciliation is meant to be *informal*, and so the Court hesitates to impose rigid rules and regulations upon the Commission.  The Court can imagine that, in some instances, the Commission may seek to settle one type of claim, without holding protracted talks on the other — the theory being that any sizeable settlement is good enough — and so may not put as much emphasis during conciliation on certain of its claims.  In that vein, the Court does not believe it appropriate to force the Commission to request separate monetary settlements, one for § 706 and another for § 707.  And, since it seems possible that voluntary compliance measures — fixing hiring practices and the like — could often ameliorate the root causes of both types of claims, the Court does not believe the EEOC should be forced — not by the judiciary, anyway — to treat voluntary compliance with § 706 differently from voluntary compliance with § 707.[1]  *See, e.g.*, *EEOC v. State of Ariz., Dep't of Admin.*, 824 F. Supp. 898, 901 (D. Ariz. 1991) ("Generalized conciliation is acceptable for prospective relief."). The bottom line is that, while the Commission cannot wholly ignore any of the claims it intends to eventually bring in court, and certainly must apprise the would-be defendant of some basis for any claim it will ultimately press in litigation,

---

[1] To be sure, the foregoing analysis is tempered by the fact that the Commission cannot "attempt conciliation on one set of issues and having failed, litigate a different set." *EEOC v. Sears, Roebuck & Co.*, 650 F.2d 14, 19 (2d Cir. 1981) (internal citation omitted).

this Court does not believe the EEOC must undertake separate and distinct conciliation processes for each of its claims.

### B.   Did the EEOC Conciliate In Good Faith?

As discussed above, the Fifth Circuit in *Agro*, 555 F.3d 462, suggested a three-part framework for what courts should expect the Commission to have done during conciliation: "(1) outline to the employer the reasonable cause for its belief that Title VII has been violated; (2) offer an opportunity for voluntary compliance; and (3) respond in a reasonable and flexible manner to the reasonable attitudes of the employer."  *Id.* at 468 (citing *Klingler*, 636 F.2d at 107).   In this case, however, many of Bass Pro's arguments as to why conciliation was inadequate span multiple of those prongs.   That is, with respect to whether the EEOC was justified in not sharing how it computed the statistical shortfall at issue under § 707, that could be said to influence both whether the Commission outlined reasonable cause for its belief that a violation had occurred, and whether it responded in a reasonable and flexible manner to the reasonable attitudes of the employer.   Thus, rather than structuring its analysis around the three-part *Agro* test, the Court offers a more integrated analysis.[2]

#### 1.   § 707 Pattern-or-Practice Claim

With respect to the § 707 claims, Bass Pro acknowledges that the EEOC did engage in conciliation, but argues that it failed to do so in good faith.  (Doc. No. 119-1 at 8.)  The EEOC "alleg[ed] a 'shortfall' of 1,000 Black and Hispanic hires at Bass Pro" and "made an enormous settlement demand — $30 million — but refused to provide Bass Pro with basic information

---

[2] One allegation, discussed by Bass Pro at this Court's hearing, but which the Court does not focus on herein, is the Commission's use of "threats" during conciliation.  Bass Pro complains that the Commission threatened lengthy litigation, significant public exposure, and the possibility of more than $300 million in liability.  Not only do the first two seem as though they would go without saying, they also seem fairly innocuous.  As for the latter, Bass Pro has cast some doubt upon whether the Commission could ever win such a large figure in Court, but that the Commission may have been wrong is not so indicative of bad faith that it alters the Court's conclusion in any way.

necessary to assess its potential liability or its damages exposure."  (*Id.*)  Bass Pro further complains that "the EEOC steadfastly refused to describe the statistical methodology it used to determine the alleged 'shortfall,'" — or to make available the expert that crunched the numbers — declined to alert Bass Pro to an allegation that the company founder had "directed" managers to discriminate, and failed to adequately explain its damages calculation. (Doc. No. 119-1 at 8-9).  Bass Pro contends that these shortcoming demonstrate that the Commission failed to outline the basis for its charge and did not act in a reasonable and flexible manner, and thus that dismissal is appropriate.

A review of the relevant facts is necessary here.  It was clear from just about the beginning of this case that the Commission would be bringing a § 707 pattern-or-practice claim. Not only did the Charge and the Amended Charge explicitly cite § 707 (Doc. No. 119-4; Doc. No. 119-5), the latter document referred to Bass Pro's policies and practices, (Doc. No. 119-5 at 2-3).  That there would be a statistical shortfall claim was laid out during the investigation, not later than June 2009.  (Doc. No. 136-3 at 5.)  And by April 2010, as the investigation wrapped up and the parties began to shift their focus to conciliation, Bass Pro had begun to request the statistical model used to arrive at the alleged shortfall and made clear that it would not respond to the substance of that allegation until it had more information.  (Doc. No. 119-9 at 2.)

Bass Pro struck a similar note as soon as conciliation began, explaining in its May 14, 2010 letter that it would need the basis for the statistical shortfall claim before it would make a meaningful proposal.  (Doc. No. 119-15 at 2-3.)  The EEOC position was no less clear: it explained in its May 20 response that it had based the statistical shortfall claim on data provided by Bass Pro, comparing that information to "independently chosen comparators" (Doc. No. 119-

16 at 2), but that additional information would not be forthcoming.  In that letter, Bass Pro demanded $35 million as part of any settlement.  (*Id.*)

Unsurprisingly, Bass Pro's June 3 reply balked at the EEOC's unwillingness to share more information on the statistical shortfall.  It offered just $1 million, not as a substantive response to the EEOC's claims — Bass Pro did not believe it had the information necessary to do so — but just to make the case go away.  (Doc. No. 119-7 at 3; Doc. No. 119-19 at 2.)  In response, the Commission did not change its stance, but explained further that the likelihood of a statistical shortfall like the one it had documented was less than one-in-a-million and that Bass Pro would be potentially liable for $300,000 for each individual employee who would have been hired but for the alleged pattern or practice, for a grand total of $300 million.  (Doc. No. 119-18 at 3.)  With no change from the EEOC, Bass Pro likewise did not alter its tune in its reply.  It again asked for more information on the statistical claim, noting that it "[knew] of no valid method whereby a statistical conclusion such as that claimed by the EEOC can be reached." (Doc. No. 119-19 at 3.)

The parties offer conflicting takes of what exactly happened at the meeting in Dallas on August 4, 2010, but it seems as though the EEOC may have explained its statistical model in greater detail, though no one claims the Commission provided the model itself.  (Doc. No. 142-2 at 3; Doc. No. 136-3 at 10-11.)  The EEOC decreased its monetary demand to $30 million, but without more information on the statistics, Bass Pro increased its offer to only $1.7 million. (Doc. No. 136-3 at 10-11; Doc. No. 119-6 at 10.)  Bass Pro reiterated its unwillingness to make a more substantial offer without additional information.  (Doc. No. 136-7 at 3-4; Doc. No. 119-6 at 10.)  During the August 4 meeting, Bass Pro suggested its expert meet with the Commission's. (Doc. No. 119-6 at 10.)

Following the meeting in Dallas, the parties continued to exchange letters, but little changed substantively.  Bass Pro showed no willingness to budge from its request for the methodology and data underlying the § 707 claim (Doc. No. 119-22 at 3); the Commission expressed a general unwillingness to continue negotiating while the two parties were so far apart on monetary terms.  (Doc. No. 119-23 at 2-3.)  The EEOC rejected the idea of a meeting between the experts, asserting that to do so would be "unprecedented" (Doc. No. 120 at 3-4); Bass Pro asserted the Commission was guilty of "bad faith bullying," (Doc. No. 119-24 at 3).  By mid-October, with the parties at an impasse regarding what information would be shared, and $28 million dollars apart on a monetary settlement — and with little movement from either side — the Commission began to float the possibility that it was time to end conciliation.  (Doc. No. 120 at 10.)  Bass Pro's response to that letter only reiterated what it had said all along: it would not increase its settlement offer without more information.  (Doc. No. 120-1 at 12.)  Finally, upon receiving that correspondence, the Commission asserted what should have long been clear to all: conciliation was going nowhere and the EEOC would be deeming it a failure.  (Doc. No. 120-2 at 2.)

Even once conciliation had officially failed, the parties exchanged a few more letters that at least paid lip service to the possibility of settlement/conciliation.  The result, however, was the same: the Commission wanted a better offer but would not give information; Bass Pro wanted more information or else it would not make a better offer.  (Doc. No. 120-6; Doc. No. 120-7; Doc. No. 120-8; Doc. No. 120-9.)

Having reviewed that record, the Court cannot say that the Commission negotiated in bad faith.

First, the Court is not quite willing to credit that Bass Pro was as helpless as it let on. It had a broad outline of how the EEOC computed the statistical shortfall and it knew what the EEOC considered that shortfall to be. The EEOC did not, as Bass Pro intimates, fail to disclose "the results of its investigation." *La Rana Hawaii*, 888 F. Supp. 2d at 1045. Perhaps Bass Pro did not know which competitors its hiring data had been compared to or, with respect to comparisons to census data, which geographical areas the Commission had used. (Doc. No. 136-3 at 10-11; Doc. No. 142-2 at 3.) But Bass Pro had its own expert; at some point along the way, it could have picked a competitor store, or picked a geographic region, and come up with its own statistics to counter the Commission's assessment. Even without producing a statistical finding of its own, Bass Pro could have begun to make more modest requests of the Commission. It also could have made a monetary settlement offer more in line with those proposed by the Commission and made it contingent upon seeing sufficient statistical support for the Commission's claims. And, it remains uncontroverted that it would be "unprecedented" for the EEOC to make its consulting expert available to Bass Pro, so for this Court to in effect hold that it was nevertheless required to do so would not be fair. Suffice it to say, the Commission may have been frustratingly obstinate, but so too, it appears, was Bass Pro.

Second, it is important to consider the context and what else was going on as these negotiations took place. Indeed, the Court cannot ignore that the parties met and exchanged letters over a period of several years — fruitlessly — before conciliation officially began. To be sure, conciliation should be considered as its own discrete process, distinct from the investigation, in view of the statutorily mandated sequential enforcement scheme, but it would be naïve to think that how the parties interacted prior to the onset of conciliation would not affect their interactions once it had begun. Thus, it is significant that, even before conciliation

officially began, the Commission expressed its belief that it had found "evidence in several stores of record destruction, including that of minority applicants" and "evidence in several stores of [Bass Pro] not retaining applications."  (Doc. No. 119-8 at 4.)

More recently, the Commission in October 2010 expressed its belief that Bass Pro had, "at many turns, recanted on promises and ultimately deprived [the EEOC] of considerable evidence" and that it "ha[d] not fully cooperated with the investigation."  (Doc. No. 120 at 2.) The Commission alleged that Bass Pro did not provide a position statement or witness statement, refused to submit documents in response to some of the Commission's requests and "belatedly admitted to destroying all the audiotapes containing then current employee[s'] urgent complaints regarding discrimination and harassment."  (*Id.* at 2-3.) The Commission also alleged that Bass Pro refused to provide a list of over fifty names of employees who complained of discrimination and/or harassment on a Bass Pro hotline.  (*Id.* at 3.)  Finally, the EEOC complained that, though Bass Pro made available for depositions some store managers and the four highest ranking corporate Human Resource managers, Bass Pro had "imposed unreasonable time limitations on most of those interviews as well as other constraints."  (*Id.* at 4.)

Perhaps some of these allegations were untrue, exaggerated, or misunderstood.  Bass Pro certainly believes that to have been the case.  (*See* Doc. No. 120-1.)  The Court does not possibly have all the evidence it would need to decide who was right and who was wrong about Bass Pro's willingness to cooperate, and in fact, it is not particularly inclined to parse every stray allegation these parties have made about how the other has behaved.  The point is that, by late 2010, the Commission seems to have amassed numerous concerns with Bass Pro's conduct, perhaps just as many as Bass Pro had regarding the Commission's willingness to negotiate.  It is the Court's experience that this is fairly common when two parties engage in protracted, high-

stakes negotiations; to hold that against the Commission would force it to meet an unfairly rigorous standard.  There is a difference between bad faith and tried patience.

Third, and to that same point, the Court is unwilling to place too much weight upon the various monetary settlement offers exchanged.  That both parties showed a general stubbornness with respect to expectations for a monetary settlement was almost entirely derivative of their disagreement on what information ought to be shared.  That the EEOC's monetary demands were far higher than what Bass Pro offered, and that neither party ever really budged on that front, does not alter the Court's conclusion.

Fourth, with respect to the exchange of anecdotal information, Bass Pro points to the fact that the Determination made "absolutely *no mention* of the EEOC's most prominent allegation in the Second and Third Amended Complaints: that Bass Pro's founder and owner made statements that constituted a 'directive' to discriminate."  (Doc. No. 119-1 at 24-25.)  That is true, but, based on the fairly exhaustive, if somewhat vague, allegations contained in the Determination, it should not have been surprising that the EEOC would seek to put on evidence of a top-down policy of discrimination.  Moreover, Bass Pro knew, before that Determination was even issued, that the Commission boasted evidence that managers "instructed subordinates to avoid hiring qualified minorities."  (Doc. No. 119-8 at 3.)  The Court understands why Bass Pro would want to know of *every* such instance, especially if the company's founder was involved, but, given  that the Commission need not "produce as much evidence as [it] would need to prevail at trial, to satisfy the alleged wrongdoer or to meet some nonexistent burden of proof," *Sun Oil*, 605 F.2d at 1335, the Court is not inclined to find dispositive that the EEOC failed to disclose some of its anecdotal evidence.  Further, that Bass Pro's briefing in this case argues that it should have had an

"opportunity to respond to this *untrue* allegation" suggests that sharing it would have led only to another rote denial.

None of this is to say that the Court is particularly impressed by the EEOC's conciliation efforts.  For instance, revealing earlier on that the company's founder encouraged discrimination seems like it would have increased the odds of a settlement.  What national retailer would like such information revealed in the course of a public trial?  Based upon the record before the Court, it appears conciliation was never particularly likely to succeed.  And now, not only has the EEOC come perilously close to having its claims thrown out for failure to conciliate, it has expended significant resources litigating this case, will likely have to expend significantly more, and could ultimately lose and get *nothing* for its efforts.  Nonetheless, that it failed to make conciliation count is not necessarily indicative of bad faith.

Ultimately, the Court believes this to be a case where "the parties' proposals and discussions [we]re so divergent as to seem irreconcilable," and so it "will not require the EEOC to conduct Sisyphean negotiations to meet its statutory mandate to conciliate."  *Bloomberg II*, 751 F. Supp. 2d at 640 (analyzing conciliation of § 707 claims).  As in *Bloomberg II*, "[g]ven the parties' communications during conciliation, the EEOC likely had little hope of making significant progress."  *Id.*  Thus, "[m]aking inferences in a light favorable to the EEOC, the Court cannot say that the EEOC failed to make a good faith effort to conciliate the discrimination claims."  *Id.*[3]

---

[3] The Court is well aware that, with respect to other claims, the *Bloomberg II* court explained:

> Faced with a grand total of over $41 million in monetary demands, Bloomberg requested more information about the charges and the basis for the EEOC's determination before proceeding to make monetary offers. Bloomberg's attitude was reasonable: it was faced with large monetary demands and wanted additional information to evaluate the claims and respond accordingly. Bloomberg, throughout the letter exchange, stated that it was amenable to further discussions, including discussions on classwide claims. Importantly, its posture here stands in marked contrast

2.  *§ 706 Failure-to-Hire Claim*[4]

First, with respect to the Commission's § 706 failure-to-hire claim, Bass Pro has argued that, "[d]espite . . . repeated requests, the EEOC refused to identify a single allegedly aggrieved individual in either the original or amended Commissioner's charge, in its reasonable cause determination, or during conciliation."  (Doc. No. 119-1 at 8.)  Because it believes the EEOC "simply skip[ped] the statutorily required conciliation process," it urges the Court to dismiss the § 706 failure-to-hire claims.  (*Id.*)  An inquiry similar to the one above into just how conciliation transpired is necessary to determine whether the Commission's efforts were reasonable under the circumstances.

Both the original Charge, issued in February 2007, and the Amended Charge, issued in May 2008, explicitly refer to § 706.  (Doc. No. 119-4 at 2; Doc. No. 119-5 at 2.)  The Amended Commissioner's Charge explained that "persons aggrieved include all applicants, deterred applicants, employees and former employees who have been, continues to be, or will in the future be adversely affected by any of the unlawful employment practices set forth in the foregoing charge."  (Doc. No. 119-5 at 3.)  It was not more specific than that.

In the course of the EEOC investigation, Bass Pro asked for details of all specific incidents referred to by the Commission (*see, e.g.*, Doc. No. 119-9 at 3, 4), though it did not ask

---

to its approach to the EEOC's conciliation efforts for the discrimination claims, where Bloomberg essentially refused to discuss class-type relief at all.

Yet the EEOC refused to offer any additional information about its determinations. (Wong Decl. Ex. 45.) The most it offered was vague statements that it had interviewed a "fair number" of women and then extrapolated from those interviews an amount it determined was acceptable for the class claim pool. [Citation.] In the specific circumstances of this case, where the charges were varied and numerous, the basic information provided to outline the charges was insufficient for Bloomberg to be able to formulate a reasonable monetary counteroffer.

*Bloomberg II*, 751 F. Supp. 2d at 641-42.  Here, where the EEOC sought to bring a statistical hiring case, the Court believes that Bass Pro had enough information that its unflagging demands for more were not quite so reasonable.

[4] The analysis that follows does not apply to the "at least twenty claimants named in the Third Amended Complaint . . . did not even apply for employment with Bass Pro until *after* the EEOC issued its Determination on April 26, 2010." (Doc. No. 119-1 at 21.)  The Court addresses these individuals separately.

for the names of specific individuals on whose behalf the EEOC might be pressing failure-to-hire claims.  When the Commission issued its Letter of Determination, it noted that one discriminatory practice it believed Bass Pro to be guilty of was "[f]ailing to recruit and/or hire" African Americans, Asians, and Hispanics.  (Doc. No. 119-11 at 3.)  The Determination added that "evidence obtained during the investigation establishes reasonable cause to believe that there is a violation of Title VII, in that the Respondent . . . deterred and chilled African American and/or Blacks and Hispanics from applying for employment." (*Id.* at 5.)  It also said that potential remedies for Bass Pro's violations are designed "to make victims whole." (*Id.*)  But, the Determination did not offer an estimate of how many victims would make up a potential § 706 class or include any information about those individuals.

Once conciliation began in May 2010, Bass Pro again called for details regarding specific incidents of discrimination.  (*See, e.g.*, Doc. No. 119-15 at 3, Doc. No. 119-17 at 3.)  Those requests, however, can be interpreted as asking for the specifics of particular discriminatory acts, like the use of racial slurs, by Bass Pro employees, and not the specifics of each minority candidate Bass Pro had failed to hire.  For instance, in its May 14, 2010 letter, Bass Pro asked for "information necessary for Bass Pro to understand and evaluate specific instances of alleged discrimination *described in the Predetermination Letter*." (Doc. No. 119-15 at 3 (emphasis added).)  The Commission's April 12, 2010 pre-Determination letter did not discuss specific instances of Bass Pro failing to hire minority applicants.  Rather, the letter spoke more of specific occasions on which racial slurs were used or sexual harassment occurred; the closest it came to discussing specific failures to hire was an allegation that "your own managers . . . instructed subordinates to avoid hiring qualified minorities." (Doc. No. 119-8 at 3.)  Thus, the Court believes it would be fair to read that letter — and appropriate on summary judgment, where the

Court draws inferences in favor of the non-moving party — as *not* having asked for a list of all minority applicants on whose behalf the Commission would be bringing a § 706 claim.  A similar analysis of Bass Pro's June 3 letter (Doc. No. 119-17) leads to the same conclusion.[5]

In its June 21, 2010 letter, the EEOC referred to compensatory and punitive damages, suggesting that it would likely bring claims on behalf of individuals, but offered little more on the specifics of class composure.  (Doc. No. 119-18 at 3.)  As for the August 4 meeting in Dallas, the EEOC's attorney, Deputy Director Martin Ebel, has stated that Bass Pro did *not* indicate at that meeting that it wanted the names of individual claimants.  (Doc. No. 136-7 at 3.)  Somewhat to the contrary, Bass Pro's former counsel, Ms. White, says that Mr. Ebel "asserted that the EEOC had identified approximately 100 specific individuals who were alleged victims of discrimination, but stated that the EEOC would not provide Bass Pro with the names of any alleged victims except in the form of a global settlement."  (Doc. No. 119-6 at 9.)  Still, Ms. White did *not* state that she asked for information about individual victims.

The parties continued to exchange letters at a fairly rapid clip, with Bass Pro repeatedly asking for more information of all sorts and the Commission generally declining, often by telling Bass Pro that it already had the information it was asking for.  In an October 14 communication, the EEOC reminded Bass Pro that "[w]e have also repeatedly advised Bass Pro Shops of extensive anecdotal evidence of a broad range of recruiting, hiring, terms and conditions, adverse discipline, and failure to promote protected class members at issue in this case, namely African American, Hispanic, Asian American and female applicants and employees."  (Doc. No. 120 at

---

[5] The Court should note that Bass Pro attached to its June 3 letter a series of Requests For Information.  (Doc. No. 119-7 at 5-44.)  As the Commission has noted, that document contained seventy-seven requests with over 570 sub-parts.  (Doc. No. 136 at 17.)  Some of these requests did seek to ascertain the identity of classmembers.  (*See* Doc. No. 119-17 at 30-31.)  But that document, as a whole, was so wide-ranging, and sought such a herculean effort on the part of the Commission, that the Court is not willing to rely on it as evidence of exactly what Bass Pro needed before it would meaningfully engage in conciliation.  Propounding such a document does not necessarily seem consistent with genuinely trying to reach a workable solution through informal means.

4.)  Still, nothing in the record suggests that Bass Pro had offered specific information about potential class members.  In its response on November 1, Bass Pro, perhaps for the first time, asked explicitly for the Commission to "identify a description of the individuals from whom the EEOC seeks relief."  (Doc. No. 120-1 at 12.)  The EEOC's next letter, however, made clear that it planned to deem conciliation a failure.  (Doc. No. 120-2 at 2.)  It did not provide Bass Pro with the information it had sought.  (*Id.*)

It is important to situate the back-and-forth on the § 706 claim within the context of the broader conciliation process.  The letters focused mostly on the statistical shortfall claim and the specific instances on which Bass Pro employees said or did something egregious; whereas Bass Pro did repeatedly request the statistical undergirding for the § 707 claim, relatively little ink was spilled trying to home in on the specifics of the § 706 claim.[6]  And the parties disagreed so mightily on what was required with respect to the pattern-or-practice claim — again, as explained above — that, by the time Bass Pro expressly requested information on the § 706 class, conciliation had begun to look like an exercise in futility.  Put another way, the Court understands why, when Bass Pro made an unambiguous request that the Commission identify members of the § 706 class in the final paragraph of its November 1, 2010 letter, the Commission no longer believed a settlement agreement was attainable.  By then, the Commission had made up its mind.

That the Court can understand why the Commission did not respond to Bass Pro's inquiry, however, does not excuse the same.  The Court believes Bass Pro's request for that information reflected a "reasonable attitude," but the Commission's nearly immediate decision to fail conciliation, at least with respect to the § 706 failure-to-hire claim, was not a "reasonable and

---

[6] Indeed, Bass Pro appears to pay far greater attention to the § 706 claims in the course of this litigation than it did during conciliation itself.

flexible" response.  *Klingler*, 636 F.2d at 107.  The Commission should have responded in kind by providing at least some additional information about the § 706 claimants.  Still, because the Court has sanctioned the Commission's decision to end conciliation of the § 707 claim when it did, it would characterize the EEOC's decision regarding the § 706 class as "prematurely terminat[ing] negotiations," not "fail[ing] to act in good faith."  *Agro*, 555 F.3d at 469 (citing *Klingler*, 636 F.2d at 107).  Consequently, it believes a stay is the appropriate remedy.  *Id.*

Below, the Court first explains why the Commission ought to have provided the information Bass Pro sought, and then turns to why it has chosen to implement a stay, and not dismiss the claim outright, as a result.

    a.  <u>Bass Pro Deserved Information Regarding Individual Victims, But Individualized Conciliation Was Not Required.</u>

As a starting point, this Court rejects out of hand the notion that the EEOC must undertake individualized conciliation efforts regarding each and every potential class member. As the Fifth Circuit explained long ago

> unnecessarily thorough investigations of individual cases would tend to transform the conciliation process into something contrary to congressional intent. . . . Not only would the process become too formalized and unduly prolonged, but its focus would be directed away from voluntary compliance with the law to endless and irreconcilable bickering about, for example, the meaning that should be ascribed to an inadvertent statement made by a supervisor to a terminated employee.

*Sun Oil Co.*, 605 F.2d at 1335;[7] *see also EEOC v. Bruno's Rest.*, 13 F.3d 285, 289 (9th Cir. 1993) ("Moreover, 'in a class action suit, [t]he EEOC is not required to provide documentation of individual attempts to conciliate on behalf of each potential claimant.'" *Id.* (quoting *EEOC v. Rhone-Poulenc, Inc.,* 876 F.2d 16 (3d Cir. 1989))).  The *Sun Oil* court speculated that requiring

---

[7] Though an ADEA case, *Sun Oil* has long been applied in the Title VII context.  *See, e.g., Klingler*, 636 F.2d at 107; *Pet, Inc., Funsten Nut Div.*, 612 F.2d at 1002; *EEOC v. Mach Min., LLC*, 738 F.3d 171, 183 (7th Cir. 2013); *Bloomberg III*, 2013 WL 4799150; *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237, 1244 (M.D. Ala. 2001).

individualized conciliation on behalf of hundreds of class members could, by making the conciliation of such claims unreasonably expensive and time consuming, "reward the employer who discriminates on a large scale and undermine the legislative goal of obtaining voluntary compliance in these cases." *Id.* at 1134.

Moreover, as another district court explained, requiring individualized conciliation would be "unworkable, for courts could articulate no standard by which to judge the adequacy of each conciliation effort, particularly in light of the law of diminishing marginal returns. 'It would be wasteful, if not vain, to attempt to conciliate the claims of numerous employees, all with the same grievance. . . . If it is impossible to reach a settlement with one discriminatee, what reason would there be to assume the next one would be successful[?]'" *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237, 1246 (M.D. Ala. 2001) (quoting *Sun Oil,* 605 F.2d at 1338 n. 5).

The Court finds the concerns expressed in these cases to be well-placed.  As Mr. Ebel explained in his declaration "[t]he EEOC, nationwide, attempts to conciliate about 4,000 to 6,000 charges per year."  (Doc. No. 136-7 at 6.)  He said that, in 2012, for example, the Commission found cause to believe discrimination existed in 4,207 cases.  (*Id.*)  The EEOC was required to conciliate in each of them.  (*Id.*)  He opined that "[i]f many employers were to engage in conciliation in the unreasonable manner that Bass Pro did here, and if the EEOC were required to engage in efforts as extensive as those here in every conciliation, it would, in my judgment, adversely impact the EEOC's ability to investigate charges, manage its caseload, and remedy discrimination."  (*Id.*)  The Court can see why.  The parties, in briefing and arguing it, and the Court, in deciding it, devoted considerable resources to this motion; it seems inconceivable to do so hundreds of times over whenever a large § 706 class claim is entertained.

The Court also disagrees that EEOC must disclose the names of each and every member of the potential class.  This Court held in *Bass Pro II* that "the EEOC is not obligated to provide the identities of all § 706 class members."  884 F. Supp. 2d at 520.  If the Commission did not have to plead the identities of all class members, it surely cannot be the case that the Commission was required to reveal that information during conciliation.  Case law supports this conclusion.  *See, e.g.*, *EEOC v. PBM Graphics Inc.*, 877 F. Supp. 2d 334, 361-62 (M.D.N.C. 2012) ("To the extent PBM complains that particular class members were not identified during the conciliation process, the EEOC is under no obligation to make such a disclosure." (and collecting cases)); *EEOC v. Paramount Staffing, Inc.*, 601 F. Supp. 2d 986, 990 (W.D. Tenn. 2009) ("Defendant argues that Plaintiff was obligated to disclose the identities of all two hundred class members, but this argument runs contrary to case law.  'As long as the outline of the class is identified, each [person] within the 'class' need not be specifically identified in the conciliation process.'" (quoting *EEOC v. Cone Solvents, Inc.*, No. CIV.A. 3:04-0841, 2006 WL 1083406, at *9 (M.D. Tenn. Apr. 21, 2006))); *EEOC v. Lockheed Martin Global Telecommunications, Inc.*, 514 F. Supp. 2d 797, 806 (D. Md. 2007) ("The EEOC is not required to identify . . . each potential claimant in order to satisfy its duty of good faith attempts at conciliation."); *EEOC v. Jillian's of Indianapolis, IN, Inc.*, 279 F. Supp. 2d 974, 983 (S.D. Ind. 2003) (allowing EEOC to proceed on behalf of a local class even though it had not named each individual in the reasonable cause determination or conciliated individual class members).

To be sure, some recent decisions seem to indicate that the Commission must either conciliate on behalf of all potential classmembers or, as a slightly less extreme alternative, identify all potential class members by name.  *See EEOC v. CRST Van Expedited, Inc. (CRST II)*, 679 F.3d 657, 674 (8th Cir. 2012) (affirming district court's dismissal on the grounds that the

EEOC "did not attempt to conciliate the specific allegations of the 67 allegedly aggrieved persons prior to filing the Complaint");[8] *Bloomberg III*, 2013 WL 4799150, at *7, *9 (dismissing § 706 claims brought on behalf of twenty-nine claimants where the EEOC denied Defendant "a meaningful opportunity to conciliate any individual claims"); *EEOC v. Swissport Fueling, Inc.*, 916 F. Supp. 2d 1005, 1038 (D. Ariz. 2013) (finding lack of good faith "[b]ecause [the Commission] refused to provide Swissport with information on the individual claims for which it sought compensatory damages").  This Court joins the growing ranks of those that disagree.  *See, e.g.*, *EEOC v. Original Honeybaked Ham Co. of Georgia, Inc.*, 918 F. Supp. 2d 1171, 1179 (D. Colo. 2013) ("Digging somewhat deeper, however, there can be a difference between the significance of pre-litigation disclosure of the alleged unlawful conduct and pre-litigation disclosure of the specific identities and number of aggrieved persons.")*; EEOC v. Evans Fruit Co., Inc.*, 872 F. Supp. 2d 1107, 1111 (E.D. Wash. 2012) ("The undersigned is not persuaded the Ninth Circuit would adopt a rule that the EEOC must specifically identify, investigate and conciliate each alleged victim of discrimination before filing suit.")*.*  The Court believes that *Sun Oil* and the cases relying on it were right in deciding that the EEOC would cease to be an

---

[8] The panel's opinion in *CRST* inspired a spirited dissent by Judge Murphy.  679 F.3d at 695 (Murphy, J., dissenting).  She asserted that "[n]either Title VII nor our prior cases require that the EEOC conduct its presuit obligations for each complainant individually when litigating a class claim.  Rather, we have required that the EEOC perform these duties for each *type* of Title VII violation alleged by the complainant." *Id.* at 696.  Judge Murphy further explained that:

> The majority's new requirement that the EEOC separately investigate and conciliate each alleged *victim* of discrimination is inconsistent with the purpose of Title VII.  Under this standard employers can avoid disclosure to the EEOC of complaining workers while the Commission is conducting its investigation and conciliation, then reveal the names during court ordered discovery, and seek dismissal of the entire case on the ground of inadequate presuit efforts by the EEOC.  This punishes the EEOC for employer recalcitrance and weakens its ability to enforce Title VII effectively.  It also frustrates the underlying goal of the 1972 amendments intended to strengthen the EEOC's enforcement powers.

*Id.* at 696-97.  As should be clear from its analysis, this Court believed Judge Murphy had the stronger arguments.

efficient enforcer of Title VII if it were obligated to conciliate each and every individual classmember's claim.

Rather, the EEOC must share with Defendant "the outline of the class and provide the employer with sufficient information to understand the basis of the allegations and fully engage in the conciliation process." *EEOC v. Rock-Tenn Servs. Co., Inc.*, 901 F. Supp. 2d 810, 819 (N.D. Tex. 2012) (citing *Hibbing Taconite,* 266 F.R.D. at 274; *Paramount Staffing*, 601 F. Supp. 2d at 990; *Cone Solvents*, 2006 WL 1083406 at *9).   In breathing life into that standard, this Court is hesitant to impose any arbitrary requirements as to what the EEOC must *always* do. Must it always disclose the identities of *some* class members?   On the surface, that seems reasonable.   But who defines *some* and how do they do it?   More fundamentally, what good would such a requirement do?   Perhaps the employer could investigate those particular claimants and bring forth evidence that some do not belong in the class, but if those investigated claimants did not comprise the entire class, the Commission could just then assert that it would proceed to represent *other*, unnamed victims.   What then?   Another round of exchanging information about individual victims?   The permutations abound, and so the Court shies from anything that begins to look like a *per se* rule.   The Court feels strongly that "[t]he adequacy of the EEOC's conciliation attempts should be viewed on a case-by-case basis." *Swissport Fueling*, 916 F. Supp. 2d at 1037 (citing *State of Ariz., Dep't. of Admin.*, 824 F. Supp. at 901).   As such, it "rejects a categorical interpretation of *CRST* to limit the EEOC's remedy to aggrieved individuals who are specifically identified in the pre-litigation process." *Original Honeybaked Ham*, 918 F. Supp. 2d at 1180.

Still, in this case, the EEOC ought to have provided more information.   For instance, had Bass Pro had a better sense of how the class was comprised, it could have helped to weed out

claimants who had in fact been hired or whose claims did not arise until after the Commission

issued its Letter of Determination.  (Doc. No. 119-1 at 21.)  As Bass Pro has argued, it could not

have done so without the Commission sharing more information: Bass Pro explained at this

Court's hearing that it received more than a million applications between 2005 and 2010 and

that, with respect to greater than ninety percent of the applicants, it did not have information on

their race or national origin.  Given a greater sense of the class composition, Bass Pro could have

"respond[ed] to [individual] claims and show[n] why discrimination did not occur in a given

case."  *Id.*[9]   And, with respect to the damages sought, as another district court has noted,

"[c]ompensatory damages are calculated on an individualized basis, taking into account the

claimant's future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish,

and more."  *Swissport Fueling*, 916 F. Supp. 2d at 1038.  Without "information on the individual

claims for which it sought compensatory damages," — or at least *some* of those claims — Bass

Pro "was not afforded enough notice to meaningfully participate in the conciliation process."

*Id.*[10]

There are alternatives to sending a list of every class member or a detailed summary of

his or her claim.  Indeed, "there can be a difference between the significance of pre-litigation

disclosure of the alleged unlawful conduct and pre-litigation disclosure of the specific identities

and number of aggrieved persons."  *Original Honeybaked Ham*, 918 F. Supp. 2d at 1179.

---

[9] Bass Pro has also asserted that, with information about class composition, it could "attempt to resolve through conciliation any claim the EEOC determined to have reasonable cause."  (Doc. No. 120-1 at 21.)  To the extent it means that it could have conciliated each and every individual claim, the Court has already explained why the Commission need not do so.

[10] Bass Pro has also argued that, by not disclosing the identity of its classmembers, the Commission contravened its own Compliance Manual, which calls, albeit in the context of a pattern-or-practice claim, for the EEOC to "[d]efine the protected classes, detailed enough to permit the identification of persons in the class."  EEOC Compliance Manual § 34.7, 2006 WL 4673160.  The Court hesitates to place too much weight on this document, because it could, and perhaps should, be the case that the Commission requires of its staff more than the bare minimum of what the law will tolerate.  Put another way, the Court believes that there could be efforts at conciliation that fall short of the EEOC's guidelines but nevertheless pass muster in court.  This Court does not sit to conduct performance reviews.

Alternately, the Commission could have explained how it came to the conclusion that compensatory damages were appropriate, and perhaps that would have settled the issue somewhat.  Or it could have disclosed more regarding "the nature, extent, location, time period, and persons involved in the" failure-to-hire class, which may have aided Bass Pro in "reasonably estimate[ing] the number and identities of persons who may have been impacted."  *Honeybaked Ham*, 918 F. Supp. 2d at 1180.  The Court is not going to tell the EEOC exactly how to do it, but it does feel that, under the circumstances, it should have provided Bass Pro with more information.

### b.  The Proper Remedy Is A Stay.

As introduced above, the Commission decided conciliation had failed barely two weeks after Bass Pro requested the identities of the § 706 victims and without offering a substantive response.  The Court believes that to be indicative of premature termination, not bad faith.  To dismiss the case would be "too harsh a sanction," *Klingler*, 636 F.2d at 107,[11] in light of the fact that the EEOC had negotiated with Defendant for quite some time — six months as part of the official conciliation, and far longer given that the parties seem to have spoken often during the investigation — and was justified, when it ended conciliation altogether, to do so with respect to the § 707 claim.  Quite simply, the Court does not believe the Commission's conduct to have been "grossly arbitrary and unreasonable."  *Agro*, 555 F.3d at 469.

The facts of *Agro* are instructive.  The Fifth Circuit there said that dismissal would not have been an abuse of discretion — importantly, it did not suggest that the District Court *should* have dismissed for failure to conciliate — in light of the fact that the Commission issued a Letter

---

[11] In *Klingler*, the EEOC negotiated with defendant for more than two years before ultimately ending conciliation when defendant failed to satisfy the Commission's request for certain data.  *Klingler*, 636 F.2d at 106.  Without more information about the nature and course of conciliation attempts in *Klingler*, the Court acknowledges that the case for dismissal is stronger here than it seems to have been there.

of Determination and simultaneously made a settlement proposal and then, *without ever having spoken to defendant*, announced one month later that conciliation had failed.  *Id.* at 467.  Persuaded to reopen conciliation, the Commission failed to respond at all to a question posed by defendant and waited ten months to reject defendant's settlement offer.  *Id.*  Bass Pro points to *Agro*'s references to an "insupportable demand for compensatory damages as a weapon to force settlement" and to a "take-it-or-leave-it demand," *id.* at 468, and argues that the Commission behaved similarly here, but putting those quotations in context, the Commission was far more accommodating and responsive in this case than it was in *Agro*.

Bass Pro also relies upon *EEOC v. First Midwest Bank, N.A.*, 14 F. Supp. 2d 1028 (N.D. Ill. 1998), in which Bass Pro believes "the EEOC's conduct [wa]s remarkably similar to its conduct" here (Doc. No. 119-1 at 27), to support its argument that dismissal is appropriate.  It is true that there, like here, the Commission failed to provide information about individual classmembers.  *Id.* at 1032.  And ultimately, the Court in *First Midwest* did find a lack of good faith.  *Id.* at 1033.  But there was a pervasive failure to communicate there.  S*ee, e.g.*, *id.* at 1033 ("First Midwest accepted the EEOC's offer to meet, but could only schedule a meeting in the first few days of October.  Within four days, the EEOC determined conciliation efforts had failed."). The Court does not believe that to have been the case here.  Likewise, there was an arbitrariness to the EEOC's conduct in *First Midwest*, *see, e.g.*, *id.* ("Additionally, the EEOC provides no explanation for why September was the cut-off date for conciliation negotiations.  It appears to be an arbitrary date with no particular meaning and, under the circumstances, there is no reason conciliation negotiations could not have continued into October."), far beyond what took place here.  Finally, not only is *First Midwestern* a non-binding district court opinion that is factually distinguishable, but it also loses persuasive value in light of the fact that the court did

not believe that dismissal was a permissible remedy, *id.* at 1031.  There is no telling whether it would have levied such a drastic sanction had it been so empowered.

The Court acknowledges that at least two more recent decisions suggest that it has acted too leniently here.  In *CRST II*, 679 F.3d 657, the Eighth Circuit affirmed by a 2-1 vote the district court's decision to "bar[] the EEOC from pursuing claims as to 67 women based on its conclusion that 'the EEOC did not investigate, issue a reasonable cause determination or conciliate the claims.'"  *Id.* at 672 (quoting *EEOC v. CRST Van Expedited, Inc. (CRST I)*, No. 07-CV-95-LRR, 2009 WL 2524402, at *19 (N.D. Iowa Aug. 13, 2009)).[12]  There, from "the date that the EEOC filed suit, until nearly two years thereafter, the EEOC did not identify the women comprising the putative class despite the district court's and CRST's repeated requests to do so."  *Id.* at 669.  In fact, "[t]he district court concluded that the EEOC did not know how many allegedly aggrieved persons on whose behalf it was seeking relief, but [i]nstead . . . was using discovery to find them."  *Id.* (internal quotation marks omitted).  The district court believed that this represented "the EEOC . . . wholly abdicat[ing] its role" and thus that a stay was more appropriate than dismissal.  *CRST I*, 2009 WL 2524402, at *19 n.24.  Affirming the district court's use of its discretion to do so, the court of appeals explained that, where the EEOC fails to "appris[e] the employer of the charges lodged against it, the employer has no meaningful opportunity to conciliate."  *CRST II*, 679 F.3d at 676.[13]

*CRST* is distinguishable on several grounds.  First, in *CRST*, the defendant had made "repeated requests" for the Commission to disclose the identities of putative class members, *id.*

---

[12] The Eighth Circuit panel in *CRST* cited the district court's opinion numerous times.  This Court will omit further internal citations to the opinion below.

[13] Dissenting, Judge Murphy asserted that "the EEOC made genuine efforts to resolve the dispute administratively and it was CRST that thwarted administrative resolution by providing the EEOC with incomplete information and rejecting its conciliation proposal.  Given the EEOC's substantial presuit efforts, the district court's dismissal of trial worthy claims on the ground that the EEOC failed to complete its statutory duties should be reversed.  At most, the case might have been stayed for further conciliation."  *CRST*, 679 F.3d at 697 (Murphy, J. dissenting).

at 669, whereas here, Bass Pro only made one *particularized* request.  Second, the *CRST* district court determined that the EEOC had not even identified class members for its own purposes before litigation began, and based its holding just as much, if not more, on a failure to investigate as on a failure to conciliate.  *See id.* at 676-77.  Here, the EEOC only, as Bass Pro puts it, "refused to identify those claimants it said it *had discovered*."  (Doc. No. 119-1 at 20.)  While Bass Pro characterizes this behavior as more egregious, *id.*, the Court believes the opposite is true: unlike in *CRST*, the allegations of abdication of duty are almost entirely confined here to conciliation.[14]  Third, well into the third year of *litigation* in *CRST*,  "it was unclear whether the instant Section 706 lawsuit involved two, twenty or two thousand allegedly aggrieved persons." *CRST II*, 679 F.3d at 669 (internal quotation marks omitted).  Here, Bass Pro appears to have been given at least a rough estimate of the class size by August 2010, squarely in the middle of the conciliation period.  Likewise, the Charge that initiated this case was a commissioner's charge, and one that explicitly cited § 706, whereas in *CRST*, the charge was made only by an individual claimant, *id.* at 666, and thus was less likely to give the employer notice that class-wide discrimination would likely be alleged.  Finally, the § 706 claim at issue here is for failure to hire, which the Commission believes "do[es] not require a highly individualized assessment" (Doc. No. 136 at 36 n.92), while *CRST* dealt with a claim that the employer was responsible for sexual harassment of existing employees.  *Id.* at 667.  With respect to such claims, "there is less of a basis to presume that all members of the protected class are similarly aggrieved, the severity and pervasiveness necessarily varies for each aggrieved person, and unwelcomeness carries a subjective element."  (Doc. No. 136 at 36 n. 92.)

---

[14] Bass Pro does complain that "at least twenty claimants named in the Third Amended Complaint . . . did not even apply for employment with Bass Pro until *after* the EEOC issued its Determination on April 26, 2010."  (Doc. No. 119-1 at 21.)  The Court addresses these individuals separately.

In *Bloomberg III*, at least partially because of the Commission's failure to identify claimants, the court held that the EEOC had "completely abdicate[d] its role in the administrative process."  2013 WL 4799150, at *10.  Relying in part on *CRST*, It held that "the appropriate remedy [would be] to bar the EEOC from seeking relief on behalf of the Non-Intervenors at trial and dismiss the EEOC's Complaint."  *Id.* at *10.  Chief Judge Preska "recognize[d] that certain of the Non-Intervenor claims may be meritorious but now will never see the inside of a courtroom," but explained nevertheless that, to allow the claims to move forward "would be sanctioning a course of action that promotes litigation in contravention of Title VII's emphasis on voluntary proceedings and informal conciliation."  *Id.* at *11.  Admittedly, the facts of *Bloomberg III*, where the Commission declared conciliation a failure just one day after defendant requested information on potential claimants, *id.* at *3, are similar to those at issue here.  This Court likely would have reached a different result.

The Seventh Circuit's recent decision in *EEOC v. Mach Min., LLC*, 738 F.3d 171 (7th Cir. 2013), while clearly somewhat at odds with binding Fifth Circuit precedent, nevertheless offers some valuable insight.[15]  First, Judge Hamilton made clear that, if dismissal for failure to conciliate becomes too readily available, employers will be incentivized "to turn what was meant to be an informal negotiation into the subject of endless disputes over whether the EEOC did enough before going to court."  *Id.* at 179.  Employers will be tempted to do so, he posited, not "out of a desire to see their adversary across the negotiating table again, but rather with the "hope to win . . . dismissal of the case."  *Id.* at 179.  Judge Hamilton explained that, "[i]f an employer engaged in conciliation knows it can avoid liability down the road, even if it has engaged in unlawful discrimination, by arguing that the EEOC did not negotiate properly — whatever that

---

[15] In short, the court in *Mach Min.* "disagree[d] with [its] colleagues in other circuits [including this one] and h[e]ld that the statutory directive to the EEOC to negotiate first and sue later does not implicitly create a defense for employers who have allegedly violated Title VII."  *EEOC v. Mach Min., LLC*, 738 F.3d 171, 172-73 (7th Cir. 2013).

might mean — the employer's incentive to reach an agreement can be outweighed by the incentive to stockpile exhibits for the coming court battle." *Id.* He further noted that "the cost to the employer of pursuing that defense rather than settling before suit is filed is likely to be relatively low" and "[t]he potential gains of escaping liability altogether will, in some cases, more than make up for the risks of not engaging in serious attempts at conciliation." *Id.* The Court finds that reasoning sound. It is aware that the Fifth Circuit has said that dismissal should remain an arrow in the district court's quiver, but believes nonetheless that dismissal is a remedy that should be resorted to only in truly extraordinary cases, or else, as Judge Hamilton noted, the incentives for employers will fall out of balance.

In contrast, the Court does not believe that imposing too high a hurdle for dismissal will incentivize the EEOC to "abandon conciliation altogether or misuse it by advancing unrealistic and even extortionate settlement demands." *Id.* As the Seventh Circuit explained, it seems unlikely that "EEOC field offices are so eager to win publicity or to curry favor with Washington by filing more lawsuits that they will needlessly rush to court." *Id.* at 179-80. Rather, "the agency has its own powerful incentives to conciliate, and the available data show that it does so. The EEOC currently processes and investigates nearly 100,000 charges of discrimination a year, but it ultimately files suit in only a few hundred cases. In fiscal year 2012, the agency attempted conciliation in 4207 cases, was unsuccessful in 2616, yet filed suit on the merits in just 122. That so few *unsuccessful* efforts at conciliation end up in court shows how constrained the agency is by practical limits of budget and personnel." *Id.* at 180 (citing All Statutes: FY 1997 Through FY 2012, http://www. eeoc.gov/eeoc/statistics/enforcement/all.cfm; EEOC Litigation Statistics, FY 1997 Through FY 2012, http://www.eeoc. gov/eeoc/statistics/enforcement/litigation.cfm).[16]

---

[16] There was a slight uptick in EEOC litigation in 2013. The EEOC attempted conciliation in 3,515 cases, was unsuccessful in 2,078, and filed suits on the merits in 131. *See* All Statutes: FY 1997 Through FY 2013,

Judge Hamilton added that "[t]he agency's practices and priorities are also checked . . . by the two other branches of government." *Id.*

In short, the Court believes that it ought to keep the bar for dismissal high, perhaps above where it has been set by *CRST* and *Bloomberg*. By alerting "the next employer the EEOC investigates" that it will not "benefit" from "using the conciliation process as a strategic defense rather than a chance to settle," *id.* at 184, an exacting standard may help to prevent employers from abusing the conciliation process. At the same time, keeping the bar high does not carry with it the attendant risk that the Commission will routinely abdicate its duty.

This Court also agrees with the Seventh Circuit that "the significant social costs of allowing employment discrimination to go unaddressed in these situations are likely to outweigh any marginal gain in deterrence." *Id.* at 184. In referring to social costs, Judge Hamilton meant that dismissal inevitably means that "dozens of potentially meritorious . . . claims may now never see the inside of a courtroom." *CRST I*, 2009 WL 2524402, at *19; *Bloomberg III*, 2013 WL 4799150, at *11 (same). Quite simply, the Court cannot agree that to allow cases like *CRST*, *Bloomberg*, or even this one to go forward "would work a greater evil insofar as it would permit the EEOC to perfect an end-run around Title VII's 'integrated, multistep enforcement procedure.'" *CRST I*, 2009 WL 2524402, at *19 (quoting *Occidental Life Ins. Co. of Calif. v. EEOC*, 432 U.S. 355, 359 (1977)). To the contrary, "[a] paramount consideration" for this Court "is that individual claimants should not be prejudiced as the result of a failing on the part of the EEOC." *Evans Fruit*, 872 F. Supp. 2d at 1116. Only where the Commission acts in blatant disregard of its duties, and where the showing of bad faith is manifest, is the Court inclined to

---

http://www. eeoc.gov/eeoc/statistics/enforcement/all.cfm; EEOC Litigation Statistics, FY 1997 Through FY 2013, http://www.eeoc. gov/eeoc/statistics/enforcement/ litigation.cfm (both sites last visited March 2, 2014). Thus, the agency litigated 6.3 percent of cases in which conciliation failed, up from 4.7 percent in 2012. That figure was 8.7 percent in 2011, however, so the Court is not prepared to say that 2013 saw some marked shift in the EEOC's willingness to litigate.

agree that the Government not "turn[ing] square corners" works greater harm than does the denial of a day in court for those who are subjected to employment discrimination. *CRST I*, 2009 WL 2524402, at *19

Finally, the *Mach Mining* court astutely pointed out that "the Supreme Court has made clear that, as a general rule, the remedy for a deficiency in a process is more process, not letting one party off the hook entirely." *Id.* at 184 (citing, e.g., *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004); *Vitek v. Jones,* 445 U.S. 480, 495-97 (1980); *Fuentes v. Shevin,* 407 U.S. 67, 96-97 (1972)). This Court believes that, by reserving dismissal for only the truly egregious case, it can remain faithful to binding Fifth Circuit law and also adhere to the spirit of these Supreme Court precedents.

* * *

"Where the EEOC has at least made an attempt to conciliate the employment violations," *Swissport Fueling*, 916 F. Supp. 2d at 1044 (citing *EEOC v. Crye-Leike, Inc.,* 800 F. Supp. 2d 1009, 1019 (E.D. Ark. 2011)), but "conciliation was ended prematurely," *Bloomberg II*, 751 F. Supp. 2d at 643, a stay is the appropriate remedy. It is true that we are no longer "early in the litigation process," *id.*, and the Court has no false hopes about the likelihood of a settlement being reached during the next thirty days, given that the parties have had numerous opportunities to reach an agreement over the last several years, (*see* Doc. No. 136 at 41 (asserting that Bass Pro "has twice rejected the EEOC's offer of a stay of the litigation to discuss[] settlement")). But, it has some hope that, with the threat of dismissal for failure to conciliate no longer looming, there may be a renewed willingness to negotiate. And though the stay is granted as a result of the premature end to conciliation of § 706 failure-to-hire claims, the Court certainly does not seek to limit the scope of what the parties discuss during the stay.

### 3. § 706 Failure-to-Hire Claimants Discovered After Determination

Less controversial is the proposition that "the EEOC can bring an enforcement action only with regard to unlawful conduct that was discovered and disclosed in the pre-litigation process." *Original Honeybaked Ham*, 918 F. Supp. 2d at 1179; *see also Swissport Fueling*, 916 F. Supp. 2d at 1036 ("It may only bring suit 'to remedy allegations of discrimination it investigates, finds reasonable cause to believe are true, and attempts in good-faith to conciliate.'" (quoting *EEOC v. Carolls Corp.,* No. 5:98–CV–1772 FJS/GHL, 2011 WL 817516 at *3 (N.D.N.Y. Mar. 2, 2011)); *EEOC v. Am. Samoa Gov't*, No. CIV. 11-00525 JMS, 2012 WL 4758115, at *9 (D. Haw. Oct. 5, 2012) ("The EEOC may not attempt to expand its claims through discovery — its investigation was limited to age discrimination claims within the DHR, and it may not use this lawsuit 'as a fishing expedition to uncover more violations'"); *CRST I*, 2009 WL 2524402, at *16 ("[A]t the time the EEOC issued the Letter of Determination on July 12, 2007, 27 of the remaining 67 allegedly aggrieved persons *had not yet been sexually harassed.*").  "To conclude to the contrary would defeat the purpose of the pre-litigation notice and conciliation requirements" and sanction the use of "pre-trial discovery" as "a substitute for pre-litigation investigation, notice, and conciliation." *Original Honeybaked Ham*, 918 F. Supp. 2d at 1179.  And it would do violence to the Supreme Court's, and Congress's, insistence that Title VII's "overall enforcement structure" should be "a sequential series of steps beginning with the filing of a charge with the EEOC." *Occidental Life*, 432 U.S. at 372.

Thus, the Court feels compelled to grant Defendant's motion with respect to individuals who applied to work at Bass Pro after April 26, 2010, when the Letter of Determination was issued  (*see* Doc. No. 119-1 at 21 & n.78) because the Commission could not possibly have learned about these individuals during its investigation and could not possibly have conciliated

their claims.[17]  This decision may seem a bit formalistic; practically speaking, these individuals whose claims are now dismissed are barely distinguishable from others whose names the Commission did not share, or have to share, with Bass Pro.  But, in fact, dismissal of these individuals is consistent with the Court's broader holding: the Commission should have shared some information that would have helped Bass Pro to identify § 706 classmembers, and there is no piece of information it could have shared that would have alerted Defendant to the existence of classmembers who had not even yet applied for employment.

   4.   *§ 706 Retaliation Claims*

   Though the parties spend only small sections of their briefs addressing § 706 retaliation claims, the Court finds this to be a rather tricky issue.  On one hand, the Court believes that the above logic also compels dismissal of the § 706 retaliation claims that are still pending and on which the EEOC has not even issued a determination, let alone attempted to conciliate.  (Doc. No. 119-1 at 22.)  On the other hand, this case began with a Commissioner's Charge, the amended version of which mentions retaliation (Doc. No. 119-5 at 2), as did the Letter of Determination (Doc. No. 119-11 at 4).  Thus, if the members of the individuals on whose behalf the EEOC has brought § 706 retaliation claims did not need to file a Charge in the first place, what difference should it make that the Charges they did file are still pending?  Because the Court believes the parties could be of additional assistance in deciding this issue, it will hold a brief hearing to address it following the conclusion of the thirty-day stay.

---

[17] One possible gray area is claimants who applied *during conciliation* (between May and November 2010).  It is possible, at least in theory, that the EEOC investigated those claims and was aware of them by the time it ended conciliation.  If it believes this to have been the case with respect to any of the twenty claimants herein dismissed, it should file a motion explaining (and documenting) as much.

## IV.    MOTION TO AMEND

The Commission has moved to substitute Tracker Marine Retail, LLC for Tracker Marine, LLC.  (Doc. No. 135.)  The EEOC explains that "[n]aming Tracker Marine, LLC was justified because Defendants listed that entity, and not Tracker Marine Retail, LLC, in its Certificate of Interested Parties."  (*Id.* at 2.)  The EEOC further explains that "[t]here is no doubt that the company that employs the individuals who work in the 'Tracker Marine' boating centers and showrooms in Bass Pro's retail stores was a Respondent in the EEOC Amended Commissioner's Charge, was involved in the EEOC's administrative investigation and conciliation, and was on notice of this lawsuit.  The only issue here is that the EEOC incorrectly named the company as Tracker Marine, LLC rather than Tracker Marine Retail, LLC."  (*Id.* at 3-4.)

Bass Pro indicated at this Court's hearing that it does not object to adding the correct Tracker Marine Retail, LLC, but that it would rather Tracker Marine, LLC, be dismissed *with prejudice*.  The Court sees no reason to do so, given that, as the Commission has argued, it could in theory be revealed during discovery that the two Tracker Marines never should have been swapped in the first place.  To the extent that Bass Pro is worried that dismissal without prejudice will allow the Commission freely to add defendants and claims down the road, it can rest assured that the Court would look skeptically upon any such motion.

The Court thus **GRANTS** the Commission's Motion to Amend and dismiss Tracker Marine, LLC **WITHOUT PREJUDICE**.  Following the conclusion of the thirty-day stay, the Commission should file a Fourth Amended Complaint.

## V.      CONCLUSION

The Court has reviewed an extensive amount of correspondence exchanged by these parties, dating back to the investigation and early days of conciliation.  It seems from the tone of that correspondence that conciliation in this case was perhaps always a long-shot.  The Court cannot say why this was or where things went wrong; perhaps the EEOC was never as open with Defendants as it should have been.  Maybe Defendants were always intent on trying to win this case through a conciliation-related dismissal.  But in any event, there is no mistaking the marked acrimony between these parties that predated the start of conciliation.  And once conciliation began, it now seems clear that both sides could have engaged more skillfully and respectfully.

But Defendants seek dismissal, and so the question is whether the EEOC acted "grossly arbitrary and unreasonabl[y]."  The Court does not believe that it did.  With respect to the § 707 claim, the Court believes that, by November 2010, the Commission was justified in declaring conciliation of that claim a failure.  And with respect to the § 706 failure-to-hire claim, the Court believes the Commission should have continued to engage Defendant, but that its decision to do the opposite was not made in bad faith.

To review, the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  The § 707 claim can move forward.  The Court orders a 30-day stay for further conciliation on the § 706 failure-to-hire claim, but dismisses those individuals who had not yet applied to work for Bass Pro when the Commission issued its Letter of Determination.  Following the stay, The Court will hold a brief hearing to determine the proper outcome with regard to the § 706 retaliation claims.  And the Motion to Amend is granted, with Tracker Marine, LLC dismissed without prejudice.

41

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 4th day of March, 2014.

**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**